T.C. Memo. 1998-413


UNITED STATES TAX COURT


LOUISE B. BARNES, DONOR, ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13850-96, 13851-96,    Filed November 17, 1998.
            13852-96, 13856-96,
            13857-96, 13896-96,
            14049-96, 14050-96.


<u>David D. Aughtry</u> and <u>David W. Siegel</u>, for petitioners.

<u>Eric B. Jorgensen</u> and <u>Amy Campbell</u>, for respondent.

---

[1] Cases of the following petitioners are consolidated herewith:  John M. Barnes, Donor, docket No. 13851-96; Edwin L. Barnes, Donor, docket No. 13852-96; Frank S. Barnes, Jr., Donor, docket No. 13856-96; Mary Anne G. Barnes, Donor, docket No. 13857-96; Jean D. Barnes, Donor, docket No. 13896-96; Vera W. Helmly, Donor, docket No. 14049-96; and Robert L. Helmly, Donor, docket No. 14050-96.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' gift tax for 1992 as follows:

| <u>Taxpayer</u> | <u>Docket number</u> | <u>Deficiency</u> |
|---|---|---|
| Louise Barnes | 13850-96 | $169,039 |
| John M. Barnes | 13851-96 | 169,143 |
| Edwin L. Barnes | 13852-96 | 169,039 |
| Frank S. Barnes, Jr. | 13856-96 | 196,226 |
| Mary Anne G. Barnes | 13857-96 | 196,226 |
| Jean D. Barnes | 13896-96 | 169,143 |
| Vera W. Helmly | 14049-96 | 133,350 |
| Robert L. Helmly | 14050-96 | 133,350 |

The issues for decision are:

1.    Whether the fair market value of Home Telephone Co. voting common stock in January and December 1992 was $389 per share, as respondent contends; $216.56 per share, as petitioners contend; or some other amount.  We hold that it was $227.41 per share.

2.    Whether the fair market value of Rock Hill Telephone Co. nonvoting common stock in December 1992 was $410 per share, as respondent contends; $186.55 per share on December 22, 23, and 26, 1992, and $179.03 per share on December 30, 1992, as petitioners contend; or some other amount.  We hold that it was $201.12 per share on December 22, 23, and 26, 1992, and $193.34 per share on December 30, 1992.

Section references are to the Internal Revenue Code in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

## I. FINDINGS OF FACT

### A. Petitioners

Petitioners lived in South Carolina when they filed the petitions in these cases.

Edwin L. Barnes and Louise Barnes are married. Frank S. Barnes, Jr., and Mary Anne G. Barnes are married. John M. Barnes and Jean D. Barnes are married. Edwin, Frank, and John Barnes are brothers and are the children of Francis May Barnes and Frank S. Barnes, Sr. They are the grandsons of E.L. and Mary Sanders Barnes.

Ladson A. Barnes, Sr., who was one of three sons of E.L. Barnes, died on March 11, 1984. Ladson A. Barnes, Jr., was the son of Ladson A. Barnes, Sr.

Vera W. Helmly and Robert L. Helmly (the Helmlys) are married.

### B. Rock Hill Telephone Co.

Rock Hill Telephone Co. (Rock Hill) was organized in 1894 under the laws of South Carolina. It is primarily engaged in the business of providing local telephone service in the city of Rock Hill, South Carolina, and in York and Chester counties.

-4-

1.  Ownership of Rock Hill

At all times relevant to this case, Rock Hill had outstanding 80,000 shares of voting stock[2] and 164,760 shares of nonvoting common stock.[3]  The members of Rock Hill's board of

_____

[2] On Dec. 22, 1992, immediately before the gifts in question, the voting common stock of Rock Hill was held as follows:

| Shareholder | Number of shares | Percentage |
|---|---|---|
| Estate of Ladson A. Barnes | 33,348 | 41.69% |
| Edwin L. Barnes | 13,866 | 17.33 |
| John M. Barnes | 13,867 | 17.33 |
| Frank S. Barnes, Jr. | 13,867 | 17.33 |
| Rebecca B. Francis, Trustee for Ladson Barnes, Jr., Trust | 3,000 | 3.75 |
| Oma W. Barnes | 1,655 | 2.07 |
| Ladson A. Barnes, Jr. | 397 | .50 |
| Total | 80,000 | 100.00% |

[3] On Dec. 22, 1992, immediately before the gifts in question, the nonvoting common stock of Rock Hill was held as follows:

| Shareholder | Number of shares | Percentage |
|---|---|---|
| Estate of Ladson A. Barnes | 68,198 | 41.39% |
| Edwin L. Barnes | 18,893 | 11.47 |
| John M. Barnes | 18,156 | 11.02 |
| Frank S. Barnes, Jr. | 18,198 | 11.05 |
| Rebecca B. Francis, Trustee | 0 | 0 |
| Oma W. Barnes | 3,262 | 1.98 |
| Ladson A. Barnes, Jr. | 6,340 | 3.85 |
| Edwin L. Barnes, Jr. | 1,536 | 0.93 |
| Mary Lea B. Tyler | 1,645 | 1.00 |

(continued...)

directors were Frank Barnes, Jr., John Barnes, Willard K. Gaillard, Edwin Barnes, and Ladson Barnes, Jr.

In 1912, E.L. Barnes acquired the stock of Rock Hill. Rock Hill has been owned and operated by the Barnes family for more than 80 years. The Barnes family has taken steps (described below) to preserve its control of Rock Hill. There have been no sales of Rock Hill common stock since 1912.

Frank Barnes, Jr., and Edwin Barnes began working for Rock Hill in 1946. Frank Barnes, Jr., was president, chief executive officer, and chairman of the board of directors in 1992. Edwin Barnes was its secretary and treasurer in 1992. John Barnes was one of Rock Hill's vice presidents in 1992.

Four members of the fourth generation of the Barnes family (i.e., great-grandchildren of E.L. Barnes) worked for Rock Hill

---

[3](...continued)

| | | |
|---|---|---|
| Estate of Francis M. Barnes | 13,642 | 8.28 |
| Charles Douglas Barnes | 1,831 | 1.11 |
| Anne B. Grant | 1,645 | 1.00 |
| Bryant G. Barnes | 1,620 | 0.98 |
| Frank S. Barnes, III | 1,620 | 0.98 |
| Mary Anne G. Barnes | 430 | 0.26 |
| Louise B. Barnes | 580 | 0.35 |
| Susan Sanders Barnes | 1,500 | 0.91 |
| Frances Talbert Barnes | 1,536 | 0.93 |
| Jean D. Barnes | 430 | 0.26 |
| John M. Barnes, Jr. | 1,831 | 1.11 |
| J. Barnes, Jr., & C. Barnes, Trustees | 338 | 0.21 |
| Jean S. Barnes | 1,493 | 0.91 |
| Susan B. Ellis | 36 | 0.02 |
| Total | 164,760 | 100.00% |

in 1992. A member of the fifth generation works for Fort Mill, a subsidiary of Rock Hill.

2. <u>The Voting Trust</u>

Frank Barnes, Jr., and his brothers intend to keep Rock Hill as a family owned business. They control Rock Hill through a voting trust. Frank Barnes, Sr., created the voting trust on April 30, 1964, to ensure that 52 percent of Rock Hill's voting stock would vote as a unit. Frank Jr., Edwin, and John (the Barneses), are the trustees of the trust and together own 52 percent of the voting stock of Rock Hill.

In 1992, the Barneses considered forming a holding company to ensure that Rock Hill would remain in the family. They also bought insurance (at a time not stated in the record) to avoid being required to sell shares of Rock Hill to pay death taxes.

3. <u>Rock Hill's Affiliates and Subsidiaries</u>

In 1992, Rock Hill owned the following percentage of common stock in Fort Mill Telephone Co., Lancaster Telephone Co., and Home Telephone Co.:

|  | Percent owned by Rock Hill |
|---|---|
| Fort Mill Telephone Co. (Fort Mill) | 48.0% |
| Lancaster Telephone Co. (Lancaster) | 49.2 |
| Home Telephone Co. (Home) | 49.8 |

The Fort Mill, Lancaster, and Home service areas are predominantly rural. The Fort Mill and Lancaster service areas are contiguous. Fort Mill provides service in York county. Lancaster provides service in Lancaster and Chester counties. Home is located in Moncks Corner, South Carolina, and provides services in parts of Berkeley, Dorchester, and Orangeburg counties.

Rock Hill has three television cable company subsidiaries: Great Falls Cablevision, Inc.; Carolina Telecom Services, Inc.; and Winnsboro/Ridgeway Cablevision, Inc. It also has three wholly owned subsidiaries (Associated Data Services, Inc.; Stenseth Directory Service, Inc.; and Associated Telecom, Inc.), that provide services to the cable television and telecommunications industry.

4. Telephone Services Provided by Rock Hill

In 1949, Rock Hill converted its local service network to dial service. It installed electromechanical toll switching equipment in 1968, and began offering touch tone service in 1971.

Rock Hill replaced all of its electromechanical switching equipment with digital electronic switching equipment between 1981 and 1990. After it installed digital equipment, Rock Hill offered new services including call waiting, call forwarding, and conference calling. Rock Hill was converting from copper wires to fiber optics technology in December 1992.

Rock Hill had capital expenses of $5,605,184 in 1987, $5,410,879 in 1988,[4] $13,199,725 in 1989, $14,605,033 in 1990, and $6,340,042 in 1991.

Rock Hill's rates for local telephone service and special products are set by the South Carolina Public Service Commission (SCPSC). The SCPSC also regulates all intrastate service rates.

Rock Hill maintained 36,820 access lines on December 31, 1991. Each of these lines has access to inter-exchange carriers such as AT&T, MCI, and Sprint. Rock Hill also owns a 5-percent interest in a consortium that provides cellular telephone service in rural South Carolina.

5. Dividends

From 1987 to 1992, Rock Hill paid common stock dividends as follows:

| Year | Total amount of dividends | Dividends per share |
|------|---------------------------|---------------------|
| 1987 | $550,710 | $2.25 |
| 1988 | 660,852 | 2.70 |
| 1989 | 709,804 | 2.90 |
| 1990 | 819,946 | 3.35 |
| 1991 | 893,374 | 3.65 |
| 1992 | 2,937,120 | [1]12.00 |

[1] This includes $8 for a special nonrecurring dividend which Rock Hill declared on Dec. 29, 1992, payable on Dec. 30, 1992.

---

[4] Rock Hill's financial statement for 1987 and 1988 audited by KPMG Peat Marwick shows capital expenses of $5,410,879 for 1988. The audited financial statement for 1988 and 1989 shows capital expenses of $5,680,152 for 1988. The record does not explain the $269,273 difference.

C.    Home Telephone Co.

    1.    Ownership of Home

    At all times relevant to this case, Home had 77,960

outstanding shares of voting stock,[5] and the members of Home's

---

    [5] Immediately before the gifts in question, Home common
stock was held as follows:

| Shareholder | Number of shares | Percentage |
|---|---|---|
| Rock Hill | 38,800 | 49.77% |
| Robert L. Helmly, Sr. | 11,772 | 15.10 |
| Vera W. Helmly | 4,145 | 5.32 |
| Edwin L. Barnes | 2,073 | 2.66 |
| John M. Barnes | 1,890 | 2.42 |
| Frank S. Barnes, Jr. | 1,626 | 2.09 |
| D.C. Bishop | 1,600 | 2.05 |
| Estate of Harold H. Harvey | 1,600 | 2.05 |
| F.M. and Winona Peagler | 1,200 | 1.54 |
| Lisa Helmly | 1,045 | 1.34 |
| John C. Guerry, Sr. | 1,000 | 1.28 |
| Wanda Helmly Davis | 840 | 1.08 |
| Ladson A. Barnes, Jr. | 814 | 1.04 |
| Richard E. Briscoe | 800 | 1.03 |
| Robert L. Helmly, Jr. | 780 | 1.00 |
| Rebecca B. Francis, Trustee | 721 | 0.92 |
| William Shellie Helmly | 680 | 0.87 |
| Sara Helmly Carroll | 505 | 0.65 |
| Dozier H. Helmly | 500 | 0.64 |
| Jewel O. Helmly | 500 | 0.64 |
| Estate of Francis M. Barnes | 460 | 0.59 |
| Bryant G. Barnes | 320 | 0.41 |
| Frank S. Barnes, III | 320 | 0.41 |
| Estate of Ladson A. Barnes | 320 | 0.41 |
| George F. Briscoe | 320 | 0.41 |
| Anne Fishburne Briscoe | 320 | 0.41 |
| Richard E. Briscoe, III | 320 | 0.41 |
| Mary Anne G. Barnes | 282 | 0.36 |
| Stephen Shellie Helmly | 240 | 0.31 |
| Winona H. Peagler | 228 | 0.29 |
| Mary Elizabeth Williams Littlefield | 160 | 0.21 |
| Charles D. Barnes | 138 | 0.18 |

(continued...)

board of directors were Frank Barnes, Jr., John Barnes, Edwin Barnes, Robert Helmly, and Dozier Helmly.

Home was formed in 1904 in Moncks Corner.  It was later incorporated as St. Johns Telephone Co. (St. Johns).  In 1916, a local electric utility bought St. Johns.  Mary Winter Briscoe (Briscoe) bought St. Johns and named it Home Telephone Co. in 1939.  Home had 150 subscribers at the beginning of World War II.

In 1947, Briscoe sold Home to her daughter and son-in-law, Thelma and S.S. Helmly, the parents of Robert Helmly, Sr.  At the end of World War II, Home obtained a loan from the Rural Electrification Administration to expand its services.  The loan enabled Home to install its first dialing system.

Robert Helmly, Sr., began to work for Home when he was discharged from the Navy in 1953.  In 1962, Thelma and S.S.

---

[5](...continued)

| | | |
|---|---|---|
| John M. Barnes, Jr. | 138 | 0.18 |
| Jean S. Barnes | 137 | 0.18 |
| Wandell K. Harvey | 116 | 0.15 |
| Carroll H. Harvey | 114 | 0.15 |
| Troy M. Harvey | 114 | 0.15 |
| Bennie H. Ordel | 114 | 0.15 |
| Patricia H. Welch | 114 | 0.15 |
| Lila G. Bobo | 110 | 0.14 |
| Edwin L. Barnes, Jr. | 104 | 0.13 |
| Frances T. Barnes | 104 | 0.13 |
| Susan S. Barnes | 104 | 0.13 |
| S.A. or Virginia Helmly | 100 | 0.13 |
| Mary Lea Tyler | 100 | 0.13 |
| Jean D. Barnes | 82 | 0.11 |
| Julie Elizabeth Helmly | 80 | 0.10 |
| Melissa Grace Davis | 10 | 0.01 |
| Total | 77,960 | 100.00% |

Helmly sold their shares of stock in Home to their sons Robert and Dozier.  Robert is president and chief executive officer of Home.  Dozier has been a director since 1979.

In 1991, Dozier sold some of his Home stock back to the company for $252 per share, an amount that was a little above book value.

In 1992, Home's largest shareholder was Rock Hill.

2.    Telephone Services Provided by Home

Home installed its first digital line in 1966.  By 1986, all of Home's service was digital.

Home maintained 14,718 access lines on December 31, 1991. Each of these lines has access to inter-exchange carriers such as AT&T, MCI, and Sprint.

Home's local telephone services rates are set by the SCPSC.

3.    Home Telecom, Inc.

Home's wholly owned subsidiary, Home Telecom, Inc. (Home Telecom), became a partner with another company (not otherwise identified in the record) to provide cellular telephone service in the Charleston Metropolitan Statistical Area (MSA).  Home Telecom is a 25-percent nonmanaging partner in Charleston-North Charleston MSA, L.P.  On December 31, 1991, Home Telecom had about 10,160 customers.

4. Dividends

Robert Helmly has a conservative approach to paying dividends. He believes that Home's primary obligations are to modernize its plant and to reduce its debt. This philosophy is similar to that of the management of Rock Hill.

From 1987 to 1992, Home paid dividends to holders of its common stock as follows:

| Year | Total amount of dividends | Dividends per share |
|------|---------------------------|---------------------|
| 1987 | $155,920 | $2.00 |
| 1988 | 210,445 | 2.70 |
| 1989 | 327,931 | 4.20 |
| 1990 | 1,247,360 | [1]16.00 |
| 1991 | 467,760 | 6.00 |
| 1992 | 1,325,230 | [2]17.00 |

[1] This includes $12 for a special nonrecurring dividend resulting from the sale of Home's interest in Telecom U.S.A.

[2] This includes $13 for a special nonrecurring dividend resulting from concerns about impending tax law changes.

D. Petitioners' Gifts of Home and Rock Hill Stock

The Helmlys made the following gifts of Home stock in 1992:

| No. of shares | Donee | Percent of stock |
|---------------|-------|------------------|
| Gifts on 1/28/92: | | |
| 100 | Wanda Helmly Davis | .128% |
| 100 | Lisa Ann Helmly | .128 |

Gifts on 12/29/92:

| | | |
|---|---|---|
| 800 | Robert Helmly Jr., trust | 1.03 |
| 800 | William Helmly trust | 1.03 |
| 800 | Wanda Helmly Davis trust | 1.03 |
| 800 | Robert Helmly Jr., trust | 1.03 |
| 800 | William Helmly trust | 1.03 |
| 800 | Lisa Ann Helmly trust | 1.03 |
| 800 | Wanda Helmly Davis trust | 1.03 |
| 800 | Lisa Ann Helmly trust | 1.03 |
| 100 | Jason Cole Davis trust | .128 |
| 100 | Robin E. Helmly trust | .128 |
| 100 | Phallan Nicole Helmly trust | .128 |
| 100 | Arden Lin Helmly trust | .128 |
| 100 | William Travus Helmly trust | .128 |
| 100 | Preston Fhorest Helmly trust | .128 |
| 100 | Melissa Grace Davis | .128 |

Mary Anne and Frank Barnes made the following gifts of Rock Hill stock in 1992:

| No. of shares | Donee | Percent of nonvoting stock |
|---|---|---|

Gifts on 12/22/92:

| | | |
|---|---|---|
| 1,470 | Frank S. Barnes III | .89% |
| 1,470 | Bryant G. Barnes | .89 |
| 1,470 | Anne B. Grant | .89 |
| 1,470 | Mary Lea B. Taylor | .89 |

Gifts on 12/30/92:

| | | |
|---|---|---|
| 80 | Rita B. Shaw trust | .049 |
| 80 | James Bryant Grant trust | .049 |
| 80 | Benjamin Lea Grant trust | .049 |
| 80 | Catherine Iverson Grant trust | .049 |
| 80 | Michael Francis Taylor trust | .049 |
| 80 | Robert Graves Taylor trust | .049 |
| 80 | David Bryant Barnes trust | .049 |
| 80 | Emily Ann Barnes trust | .049 |
| 80 | Amanda Emily Barnes trust | .049 |

On December 30, 1992, Frank Barnes gave 6,000 shares of Rock Hill nonvoting common stock to Mary Anne Barnes.  This stock was about 2.45 percent of the total authorized and issued common (both voting and nonvoting) stock, and about 3.64 percent of the total nonvoting common stock.

Louise and Edwin Barnes made the following gifts of Rock Hill stock on December 23, 1992:

| No. of shares | Donee | Percent of stock |
|---|---|---|
| 1,900 | Susan B. Ellis | 1.15% |
| 1,900 | Frances T. Barnes | 1.15 |
| 1,900 | Edwin Barnes, Jr. | 1.15 |

On December 31, 1992, Edwin Barnes gave 4,500 shares of Rock Hill nonvoting common stock to Louise Barnes.  This stock was about 1.84 percent of the total authorized and issued common (both voting and nonvoting) stock, and about 2.73 percent of the total nonvoting common stock.

Jean and John Barnes made the following gifts of Rock Hill stock on December 26, 1992:

| No. of shares | Donee | Percent of stock |
|---|---|---|
| 1,900 | John Barnes, Jr. | 1.15% |
| 1,900 | Jean S. Barnes trust | 1.15 |
| 1,900 | Charles D. Barnes trust | 1.15 |

On December 31, 1992, John Barnes gave 4,500 shares of Rock Hill nonvoting common stock to Jean Barnes.  This stock was about 1.84 percent of the total authorized and issued common (both

voting and nonvoting) stock, and about 2.73 percent of the total nonvoting common stock.

Rock Hill stock and Home stock were not registered or traded on the New York Stock Exchange, the American Stock Exchange, NASDAQ, over the counter, or listed in National Quotation Bureau price reports (the pink sheets).

E. Petitioners' Gift Tax Returns and the Notices of Deficiency

The Helmlys each agreed to treat each of their gifts as being made one-half by the other under section 2513. Mary Ann and Frank Barnes, Louise and Edwin Barnes, and Jean and John Barnes also elected to split their gifts under section 2513.

AUS Consultants, Valuation Services Group (AUS),[6] estimated that the fair market value of Home's common stock was $230 in 1992. Based on that estimate, the Helmlys each reported on their 1992 gift tax returns that the fair market value of Home's stock was $230 per share.

AUS estimated that the fair market value of Rock Hill's nonvoting common stock was $220 on December 1, 1992. Based on that estimate, Frank and Mary Anne Barnes each reported on their 1992 gift tax returns that the fair market value of Rock Hill's stock was $220 per share, and Louise and Edwin Barnes and John

_____

[6] The AUS appraisals were admitted into evidence for the limited purpose of showing that they were sources of the factual descriptions of Home and Rock Hill used in the report prepared by respondent's expert.

and Jean Barnes each reported on their 1992 gift tax returns that the fair market value of Rock Hill's stock was $221 per share.

## II. OPINION

The issues for decision are the fair market values of Home and Rock Hill stock that petitioners gave to their children and grandchildren in 1992.

A.   Fair Market Value

Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs.  The fair market value of stock is a question of fact.[7] Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  If selling prices for stock in a closely held corporation which is not listed on any exchange are not available, then we decide its fair market value by considering factors such as the company's net worth, earning power, dividend-paying capacity, management, goodwill, position in the industry,

_____

[7] Petitioners bear the burden of proving that respondent's determinations in the notices of deficiency are erroneous, Welch v. Helvering, 290 U.S. 111, 115 (1933), and respondent bears the burden of proving the increased gift tax deficiencies resulting from respondent's amended answers.  Rule 142(a).  However, on this record, our conclusions are not affected by who bears the burden of proof.

the economic outlook in its industry, and the values of publicly traded stock of comparable corporations. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); see sec. 25.2512-2(f), Gift Tax Regs. The weight to be given to these or other evidentiary factors depends on the facts of each case. Sec. 25.2512-2(f), Gift Tax Regs.

B.   Expert Testimony

Both parties called expert witnesses to give their opinions about the value of the Home and Rock Hill stock that petitioners gave to their children and grandchildren in 1992. We may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we will accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986).

The expert witnesses at trial were: Dr. Scott D. Hakala (Hakala), for respondent, and George B. Hawkins (Hawkins), for petitioner. Their opinions and the positions of the parties as to the per share value of Home and Rock Hill stock at issue in these cases are as follows:

| Company | Application of discounts | Petitioners' returns/ petition | Petitioners' expert Hawkins | Deficiency notices | Amended answers | Respondent's expert Hakala |
|---|---|---|---|---|---|---|
| Home stock | prediscounted value | | $360.93 | | | $518 |
| | lack of marketability | | 40% | | | 25% |
| | discounted value | $230 | $216.56 | $351 | $344 | $389 |
| Rock Hill stock | prediscounted value | | $336.96 | | | $546 |
| | lack of marketability | | 45% | | | 25% |
| | lack of voting power | | 3.66% | | | 5% |
| | discounted value | $220/$221 | [1]$186.55 | $375 | $386 | $410 |

[1] Hawkins said that Rock Hill stock was worth $179.03 per share as of Dec. 30, 1992, because of the $8 special dividend payable on Dec. 30, 1992.

C.    Stock Values Before Considering Discounts

    1.    Hawkins' Analysis

[8] We believe Hawkins appropriately used the income capitalization and market or public guideline company[9] methods to appraise Home and Rock Hill stock.  He adjusted Home's and Rock Hill's earnings per share to exclude the impact of unusual or nonrecurring income and expense items.

Hawkins compared 10 local or regional publicly traded telephone companies to Home and Rock Hill.  From those companies he derived multiples for price to latest year earnings, price to 3-year average earnings, price to latest year gross cash-flow, price to 3-year average gross cash-flow, dividend yield or capitalization of latest year's dividends, and dividend yield on capitalization for 3-year average dividends.  He properly compared dividends paid by Home and Rock Hill to those paid by the guideline companies, excluding special nonrecurring dividends.

---

[8] The income capitalization method is used to estimate the fair market value of income-producing property by considering the present value of the future stream of income to be produced by that property.  See Estate of Bennett v. Commissioner, T.C. Memo. 1989-681, affd. 932 F.2d 1285 (4th Cir. 1991).

[9] The market or public guideline company method is used to estimate the fair market value of a company's stock by comparing it with the stock of similar, publicly traded (i.e., "guideline") companies.

## 2. Importance of Dividend Yield

Respondent contends that Hawkins gave too much weight to the capitalization of dividends and the capitalization of 3-year average dividends multiples. Respondent points out that section 25.2512-2(f)(2), Gift Tax Regs., and Rev. Rul. 59-60, 1959-1 C.B. 237, state that dividend-paying capacity should be considered in estimating the value of closely held stock, and that the regulation does not say to consider actual dividends. Respondent contends that the capitalization of dividends method is unreliable and rarely used because the payment of dividends allegedly has little effect on the price of stock. We disagree.

Hawkins gave more weight to actual dividends than to price to earnings and price to gross cash-flow ratios because Home and Rock Hill have significantly lower dividend payout ratios than the guideline companies. The dividend payout rates[10] of Rock Hill (12.62 percent) and Home (25.03 percent) were considerably less than that of other guideline companies, whose dividend payout rates ranged from 27.78 percent to 85.31 percent. Six of 10 guideline companies paid dividends totaling more than 50 percent of their net income. Hawkins testified that a public

[10] Dividend payout equals dividends (excluding special dividends) per share divided by the net income available per share. It measures the extent to which the company pays its earnings to shareholders.

company that has a much greater dividend payout than Home and Rock Hill will also have higher stock prices. Respondent made no convincing argument in response.

A potential buyer of Home and Rock Hill stock would reasonably assume that Home and Rock Hill would continue to pay low dividends. A prospective minority shareholder of Home or Rock Hill stock would almost exclusively consider dividend yield rather than discounted cash-flow or income capitalization to estimate the value of stock in either of these companies because of the likelihood that he or she could only recoup his or her investment through dividends. Hawkins properly considered dividends to be the most significant factor because they are the principal means by which a prospective shareholder could obtain a return on his or her investment in Home and Rock Hill.

Where there are no sales available from which to ascertain the fair market value of closely held stock, courts have considered the amount of dividends which the corporation has paid. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Leyman v. Commissioner, 40 T.C. 100, 119 (1963), remanded on other grounds 344 F.2d 763 (6th Cir. 1965); Estate of Tebb v. Commissioner, 27 T.C. 671, 675 (1957); Estate of Oman v. Commissioner, T.C. Memo. 1987-71 (Government expert used valuation based in part on capitalization of dividends).

Dividends paid can be more important than dividend-paying capacity in appraising minority interests because a minority shareholder cannot force the company to pay dividends even if it has the capacity to do so.  Pratt, Valuing a Business:  The Analysis and Appraisal of Closely Held Companies 227 (1996).

Respondent relies on Driver v. United States, 76-2 USTC par. 13,155, 38 AFTR 2d 76-6315 (W.D. Wis. 1976), for the proposition that dividends are not a significant factor in valuing closely held stock.  In Driver, the decedent made gifts of a majority of the stock in a closely held telephone company in Wisconsin.  The donee of the stock in Driver received a majority interest in and control of the company; in contrast, the donees of Rock Hill nonvoting stock had no right to participate in any decision related to the company, and the donees of Home stock had about 1 percent of the voting stock.  Thus, the donees here could not force the companies to pay dividends or salaries.

3.  Small Stock Premium

Hawkins included a small stock premium[11] of 5.1 percent in calculating the discount rate he used to capitalize Home and Rock

---

[11] A small stock premium is an increase in the discount rate used to capitalize the earnings of the stock of small companies (smaller than S&P 500) on the theory that their average rates of return are higher than those of large companies.  See Pratt, Valuing a Business:  The Analysis and Appraisal of Closely Held Companies 165 (1996).

Hill's historic earnings. Respondent contends that Hawkins should not have included a small stock premium. We agree. In Estate of Jung v. Commissioner, 101 T.C. 412, 444 (1993), we declined to apply a small stock premium because the taxpayer's expert did not provide evidence that an investment in the corporation in question was riskier simply because of its small size. Like the expert in Estate of Jung, Hawkins did not show that Home and Rock Hill were riskier merely because they are small. On the contrary, he concluded that Home and Rock Hill are financially sound and that investments in Home and Rock Hill were much less risky than in other comparably sized companies since the business of Home and Rock Hill is highly regulated.

### 4. Hakala's Analysis

We believe that Hakala did not adequately consider that: (a) Neither Home nor Rock Hill stock is likely to be sold, (b) the Barnes and Helmly families intend to retain control of their companies, (c) Home and Rock Hill paid low dividends, (d) Rock Hill nonvoting stock had no right to participate in any decision related to the company and Home voting stock had about a 1-percent vote that was ineffectual, and (e) an owner of a 1-percent interest in either Home or Rock Hill would find it hard to resell his or her interest. Hakala admitted that Rock Hill will not be sold or taken public.

Hakala used the market or guideline company approach to estimate the value of Home and Rock Hill stock, but he excluded three companies that Hawkins used as comparables[12] because he did not have their market trading prices as of the valuation date. In contrast, Hawkins apparently easily obtained the stock prices by contacting the companies.

Because of errors in preparing Hakala's report, key data relating to the discounted cash-flow method for Home and Rock Hill was not available at trial for petitioners to cross-examine.[13]  Thus, we could not consider Hakala's discounted cash-flow method without prejudicing petitioners.  We could consider only Hakala's market guideline method, which weakened the persuasiveness of his opinion.

Unlike Hawkins, Hakala did not visit Home or Rock Hill, interview the management of Home or Rock Hill, or make any other factual investigation.

5.   Conclusion

We conclude that Hawkins' methodology was reasonable, except for his use of a small company stock premium.

---

[12] Hakala did not use as comparables Concord Telephone, Mid-Plains Telephone, and North Pittsburgh Systems.

[13] We denied respondent's posttrial motion to reopen the record to supplement Hakala's report because of the risk of prejudice to petitioners.

D. Discounts

   1.   Lack of Marketability

A discount for lack of marketability may apply to minority interests in closely held corporations because there is no ready market for those shares. Estate of Andrews v. Commissioner, 79 T.C. at 953. Respondent agrees that petitioners are entitled to lack of marketability discounts for Home and Rock Hill stock.

Hawkins applied a 40-percent discount for lack of marketability to his estimate of the value ($360.93) of the Home stock, and a 45-percent discount to the value ($337.87) of the Rock Hill stock. Hakala applied discounts of 25 percent for lack of marketability to his estimate of the values of the Home ($518) and Rock Hill ($546) stock.

We agree with Hawkins' use of 40 and 45 percent discounts because: (a) The Barnes family has controlled Rock Hill for 80 years and the Helmly and Barnes families have controlled Home for 50 years; (b) both families intend to keep control of the companies; (c) the families have taken steps such as implementing a voting trust, bringing the younger generations into the business, and buying insurance to avoid having to sell shares to pay death taxes; (d) Home and Rock Hill pay much lower dividends

than the guideline companies;[14] (e) there have been no sales of Rock Hill stock and only limited family and insider sales of Home stock at about book value; (f) the Home and the Rock Hill stocks are not registered or traded on any exchange or over the counter; and (g) the Home and the Rock Hill stocks represent very small minority interests that have no ability to direct the affairs of either company or cause the sale of its assets. These facts support application of an above average discount for lack of marketability.

Respondent disagrees with Hawkins' use of some studies of sales of restricted stock and initial public offerings which respondent claims contained errors. Respondent also asserts that the companies in the studies used by Hawkins were not comparable to Home and Rock Hill. Respondent points out that Hawkins did not relate the companies in the studies to Home and Rock Hill in terms of marketability, size, profitability, history, risk, speculativeness, or growth. However, Hakala also failed to compare the companies in the studies to Home and Rock Hill on those points.

Hawkins and Hakala mostly cited the same studies. Hakala cited eight studies in which the average discount for lack of marketability ranged from 30 percent to 60 percent. He

---

[14] Stocks with low dividends typically suffer more from lack of marketability than stocks with high dividends. Pratt, supra at 358.

acknowledged that the typical discount cited for restricted stock[15] is 35 percent and said that the unregistered stock in a closely held corporation is subject to a larger discount than that applied to restricted stocks. His explanation of his use of a 25-percent discount for lack of marketability was not convincing.

2. Nonvoting Stock

Prospective buyers will pay a premium for shares with voting power or obtain a discount for nonvoting shares. Wallace v. United States, 566 F. Supp. 904, 917 (D. Mass. 1981) (voting shares appraised 5 percent higher than nonvoting shares); Kosman v. Commissioner, T.C. Memo. 1996-112 (nonvoting shares discounted by 4 percent); Estate of Winkler v. Commissioner, T.C. Memo. 1989-231.

Hawkins applied a discount of 3.66 percent for lack of voting power to the value ($337.87) of the Rock Hill stock. Hawkins based this discount on a study of 43 public companies with voting and nonvoting shares. The study found that the average discount for nonvoting stock was 3.66 percent. Hakala discounted the nonvoting stock of Rock Hill by an additional 5 percent. We find that Hawkins' use of a 3.66-percent discount for nonvoting stock was reasonable.

---

[15] Under SEC Rule 144(b), 17 C.F.R. sec. 230.144 (1984), restricted securities eventually become freely tradeable through either registration or the passage of time.

3.   Conclusion--Discounts

Based on the arguments of the parties and the record, we conclude that discounts for lack of marketability of 40 percent for the Home stock and 45 percent for the Rock Hill stock are appropriate.  We further conclude that a 3.66-percent discount for nonvoting stock is appropriate for the Rock Hill stock.  See Estate of Lauder v. Commissioner, T.C. Memo. 1994-527 (40% discount for lack of liquidity or marketability); Martin v. Commissioner, T.C. Memo. 1985-424 (70% discount for marketability/minority considerations).

E.   Conclusion

We conclude that the fair market value per share of the stock of Home that the Helmlys gave to their children and grandchildren was $227.41 per share in January and December 1992, and that the fair market value of the stock of Rock Hill that the Barneses gave to their children was $201.12 per share on December 22, 23, and 26, 1992, and $193.34 per share on December 30, 1992.[16]

To reflect the foregoing,

Decisions will be entered

under Rule 155.

---

[16] The values of Home and Rock Hill stock reported on petitioners' returns ($230 and $220/$221 respectively) are admissions by petitioners and will not be overcome without cogent evidence that they are wrong.  Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989). Petitioners have met this burden.