112 T.C. No. 13

UNITED STATES TAX COURT

ESTATE OF RICHARD R. SIMPLOT, DECEASED, JOHN EDWARD SIMPLOT,
PERSONAL REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23122-97.                    Filed March 22, 1999.

I.

Decedent owned 18 of the outstanding 76.445 shares of the voting stock and 3,942.048 of the outstanding 141,288.584 shares of the nonvoting stock of J.R. Simplot Co. (the Company), a private, family-owned corporation. The remaining shares of outstanding voting stock were owned by decedent's three siblings. The voting stock is subject to a 360-day restriction on transferability or hypothecation. Both classes of stock are entitled to the same dividends (without preference) on a per-share basis, if and when dividends are declared. Holders of the nonvoting stock are entitled to a liquidating preference.

On the estate tax return, the fair market value for both classes of stock was reported as $2,650 per share. Petitioner agrees that because of an error by its appraiser in the calculation of the aggregate number of outstanding shares, the fair market value for both classes of stock should have been $3,025 per share. In the notice of deficiency, respondent determined the fair market value of the voting stock to be $801,994.83 per share and the fair market value of the nonvoting stock to

be $3,585.50 per share. The disparate valuations are primarily attributable to the valuation methodologies employed by the parties.

Held: On the basis of the facts and circumstances presented, a premium for voting privileges is appropriate and is determined in relation to the equity value of the Company (enterprise value plus cash minus liabilities). After application of a 35-percent marketability discount, the fair market value of the voting stock is $215,539.01 per share and after application of a 40-percent marketability discount, the fair market value of the nonvoting stock is $3,417.05 per share.

## II.

In the notice of deficiency, respondent reduced the amount reported for the marital deduction from $15,127,237 to $1,723,437. The amount of this reduction ($13,403,800) is due to: (1) Respondent's redetermination of the fair market value of the voting stock, all of which was bequeathed to the trustees of a credit shelter trust for the benefit of decedent's children, and (2) the charging of the Federal estate tax to that portion of the estate (the residue) passing to decedent's wife. In calculating the amount of the marital deduction, respondent did not consider the amount of State transfer and inheritance taxes which are payable with respect to the value of the voting stock bequeathed to the trustees of the credit shelter trust and which pursuant to decedent's will are chargeable against that bequest.

Held: Because no State transfer or inheritance taxes have yet been paid, and because the amount of the marital deduction must be recalculated on the basis of our determination of the value of the voting stock passing to the trustees of the credit shelter trust, the parties must consider (and not reduce the marital deduction by) the amount of State transfer and inheritance taxes actually and timely paid by reason of the bequest of the voting stock to the trustees of the credit shelter trust.

## III.

In the notice of deficiency, respondent determined that petitioner is liable for penalties pursuant to sec. 6662(a), (g), (h)(1), and (2)(C), I.R.C. The penalties do not apply to any portion of the underpayment for which the taxpayer: (1) Had reasonable cause, and (2) acted in good faith with respect thereto.

**Held**: Petitioner is not liable for the penalties at issue because petitioner acted reasonably and in good faith by relying on the advice of tax professionals and appraisers.

David John Thornton, Gregory Allen Byron, and Sheldon I. Fink, for petitioner.

David J. Mungo and Robert A. Varra, for respondent.

JACOBS, Judge: Respondent determined a $17,643,886 deficiency in petitioner's Federal estate tax and $7,057,554 in penalties pursuant to section 6662(a), (g), (h)(1), and (2)(C).

Following a concession by respondent, the issues for decision are: (1) The fair market value of 18 shares of class A voting common stock of J.R. Simplot Co. owned by Richard R. Simplot (decedent) on June 24, 1993 (the valuation date); (2) the fair market value of 3,942.048 shares of class B nonvoting common stock of J.R. Simplot Co. owned by decedent on the valuation date; (3) the amount of the section 2056 marital deduction to be allowed the estate of decedent (petitioner); and (4) whether petitioner is liable for the section 6662 penalties as determined by respondent. Subsumed in the resolution of the stock valuation issues is the question of whether a premium should be accorded the voting privileges of the class A stock; and, if so, the amount of that premium.

All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of facts are incorporated in our findings by this reference.

A. Background

Decedent, a resident of Boise, Idaho, died testate on June 24, 1993. He was 59 years old. At the time the petition was filed herein, John Edward Simplot, decedent's son and personal representative, resided in Boise, Idaho.

Decedent and his siblings are the children of Jack R. Simplot (J.R. Simplot), who was living on the trial date of this case. At the time of his death, decedent owned 18 shares of class A voting common stock (class A voting stock) and 3,942.048 shares of class B nonvoting common stock (class B nonvoting stock) of J.R. Simplot Co., constituting 23.55 percent of the outstanding shares of class A voting stock and 2.79 percent of the outstanding shares of class B nonvoting stock. The remaining shares of class A voting stock were owned by decedent's siblings: Gay C. Simplot Otter (Gay), Don J. Simplot (Don), and Scott R. Simplot (Scott). As of the date of decedent's death, virtually all of the shares of class B nonvoting stock were owned, directly or indirectly, by the descendants of J.R. Simplot and an Employee Stock Ownership Plan (ESOP) established in 1978.

B.  The History and Business of J.R. Simplot Co.

J.R. Simplot Co. (through a predecessor entity) was founded in the 1930's by J.R. Simplot.  It was incorporated in Nevada in 1955. None of its stock is publicly traded.  J.R. Simplot originally owned all of the Company's stock; he transferred the stock to his children in the 1960's.

J.R. Simplot's philosophy was to reinvest the Company's cash-flows into long-term assets (such as real estate mineral reserves, water rights, and natural-resource-based operations), operate the Company privately, and pass ownership of the Company on to his descendants. From J.R. Simplot Co.'s inception through the valuation date, J.R. Simplot was the Company's chairman of the board and played a dominant role in the Company's operations.

J.R. Simplot Co. is a major frozen food processing and agribusiness chemical company. Its predecessor developed the technique for producing frozen French fried potatoes in the 1950's. It is headquartered in Boise, Idaho, and operates in the western part of the United States and in Mexico, Turkey, and Canada.  J.R. Simplot Co.'s taxable year ends August 31.  On the valuation date, J.R. Simplot Co. employed between 9,000 and 10,000 individuals.

For the 9 months ended May 31, 1993, J.R. Simplot Co. had net sales of $1,282,526,000 and net income of $25,506,000.  For its fiscal year ended August 31, 1993, the Company had net sales of $1,778,768,000 and net income of $37,825,000.  On May 31, 1993, J.R. Simplot Co. had assets with a book value of $1,340,803,000 and shareholders' equity of $481,001,000.  On August 31, 1993, J.R.

Simplot Co. had assets with a book value of $1,222,610,000 and shareholders' equity of $490,905,000.[1]

As of the valuation date, J.R. Simplot Co. was operationally divided into five groups: (1) The food products group (FPG), which comprises J.R. Simplot Co.'s potato, fruit, and vegetable processing operations; (2) the agriculture group (AG), which owns approximately 70,000 head of cattle and is one of the largest suppliers of cattle in the United States; (3) the diversified product group (DPG), which essentially manages two businesses--WSI, a producer and marketer of assorted agribusiness products including livestock feeds and livestock handling equipment, and Simplot Transportation, the transportation management division of the Company; (4) the minerals and chemical group (MCG), which manufactures and markets fertilizers and chemicals, mainly in the Western United States and in Canada; and (5) the development and corporate group (DCG).

1.  The Food Products Group

FPG is composed of three businesses: Potato processing, fruit and vegetable processing, and other operations. As of the valuation date, it represented approximately 55 percent or $718.3

---

[1]    J.R. Simplot Co. controlled a number of operations (e.g., a potato storage facility operated through Aberdeen Storage Limited Partnership and an office building operated through Lake Forest Limited Partnership) using "off-balance sheet financing".
    In addition, entities were established in the names of Simplot family members to acquire land, enabling J.R. Simplot Co. to obtain greater water and grazing rights.

million of J.R. Simplot Co.'s consolidated revenue for the 9-month period ended May 31, 1993.

Through its processing plants, J.R. Simplot Co. produces hundreds of millions of pounds of frozen French fries each year. It is one of the two largest potato processors in the world. Potato processing involves the following: Purchasing new-crop potatoes, sorting and grading the potatoes, storing potatoes for use in year-round production, transporting potatoes from storage facilities to the plant, washing and peeling the potatoes, cutting or forming potatoes into the desired product, precooking the potatoes, freezing the potatoes, packaging the potatoes according to customer requirements, and preparing the potato products for shipment to the end user.

FPG's five potato production facilities produce a mix of frozen French fries and formed products. The largest potato processing facilities are located in Caldwell, Idaho; Hermiston, Oregon; and Heyburn, Idaho.

FPG's potato operations serve three market segments: McDonald's, Food Service, and Consumer.[2] McDonald's is FPG's and

---

[2] The Food Products Groups' 10 largest customers (in alphabetical order) are:

> Food Service of America
> Friendly Restaurants Corp.
> Marriott Distribution Services
> McDonald's Corp.
> Nichirei Corp. of America
> PYA/Monarch Food Service
> Reddy Raw, Inc.
> Sugar Foods Corp.

(continued...)

J.R. Simplot Co.'s largest customer, consuming approximately 42 percent of the total pounds of raw potatoes FPG processes, and contributes approximately $200 million in revenues. J.R. Simplot Co. supplies McDonald's with the following amounts of potato products: 60 percent of McDonald's domestic potato products; more than 95 percent of McDonald's potato products sold in Japan; 100 percent of McDonald's potato sales in Singapore, Hong Kong, Thailand, Indonesia, and Mexico; and 80 percent of McDonald's sales in the Caribbean.

J.R. Simplot Co.'s food service segment is the fastest growing segment of potato consumption. Approximately 56 percent of the potatoes J.R. Simplot Co. processed are consumed by this segment, and revenues have increased an average of 10 percent a year since 1965. FPG provides this market with several potato products (including a variety of French fry products, hash browns, and cubed potatoes).

J.R. Simplot Co. serves the consumer market through brand names such as MicroMagic, J.R. Simplot's Retail, and Okray's Hash Browns. This segment accounts for approximately 2 percent of the potatoes J.R. Simplot Co. processes.

J.R. Simplot Co.'s competitors within the frozen potato industry include Lamb-Weston, a division of ConAgra, Inc.; Ore-Ida,

---

[2](...continued)
The Kroger Company
Victory Spud Service

a division of H.J. Heinz Co.; McCain Foods; Universal Foods; and Carnation Foods, a division of Nestle, S.A.

FPG's vegetable operation, drawing on the distribution network of J.R. Simplot Co.'s frozen potato operations, distribute more than 33 varieties of fruits and vegetables to J.R. Simplot Co.'s Food Service customers either under the Classic label or as private label products.

### 2. The Agriculture Group

AG is one of the largest suppliers of prime beef in the United States, and the largest supplier to the Pacific Northwest. For the 9 months ended May 31, 1993, AG contributed $79.2 million or approximately 6 percent of J.R. Simplot Co.'s gross revenues.

J.R. Simplot Co. raises and feeds approximately 260,000 head of cattle per year on 1.4 million acres of leased or owned land. The cattle operations complement the potato business through the use of potato waste as cattle feed.

At the time of trial, J.R. Simplot Co. sold approximately 85 percent of its cattle to IBP, Inc. In 1991, J.R. Simplot Co. entered into a contract with Nicherei Corp., a Japanese food company, whereby Nicherei Corp. buys the beef packed by J.R. Simplot Co.'s Nampa, Idaho, processing facility.

### 3. Diversified Products Group

DPG was established during the Company's 1989 fiscal year to account for opportunities in the following diverse businesses: Corporate trucking and maintenance services, refrigerated rail cars, livestock feed, animal health, farm supply services, a

commodities trading group, and two bonded grain elevators. For the 9 months ended May 31, 1993, DPG contributed $145 million or approximately 11 percent of J.R. Simplot Co.'s gross revenues.

DPG is divided into two types of operations through WSI and Simplot Transportation. WSI produces and markets a variety of agribusiness products (including livestock feeds, nutritional supplements, livestock health products, and livestock handling equipment). Simplot Transportation provides companywide transportation management (including the operation of approximately 100 to 150 bulk trailers, more than 135 owned over-the-road trucks, and 750 owned or leased rail cars). A small amount of revenue is generated from transportation for third parties.

During the 9-month period ended May 31, 1993, DPG had a loss of $0.9 million on revenue of $145 million.

4. Minerals and Chemical Group

MCG is a major manufacturer and distributor of phosphate fertilizers and agricultural chemicals in the Western United States and in Canada. It was formed in 1944 after a manufacturing plant west of Pocatello, Idaho, was constructed to supply J.R. Simplot Co. with the fertilizers it needed to nourish thousands of acres of potatoes. MCG sells the fertilizers primarily to farmers west of the Mississippi.

MCG has consistently been J.R. Simplot Co.'s most profitable segment (accounting for 31 percent of revenue for the period ended May 31, 1993). At the time of decedent's death, it had approximately 40 to 50 percent of the market. Despite the fact

that prices fell to a 20-year low, MCG reported strong results for the first 9 months of fiscal year 1993. For its fiscal year ended August 31, 1993, MCG contributed $418.5 million or approximately 32 percent of J.R. Simplot Co.'s consolidated revenues.

Mining and Processing, MCG's principal segment, operates five business units: Agricultural Fertilizer, Professional Products, Feed Phosphates, Industrial Chemical, and Consumer Products. Products mined and processed by these units are marketed throughout the Western United States and in Canadian prairie provinces by independent companies and other MCG operations, including 75 retail outlets carrying J.R. Simplot Co.'s "Soilbuilder" name. MCG employs 2,467 individuals.

The Agricultural Fertilizer business unit (36 percent of MCG's 1992 revenues) markets nitrogen and phosphate fertilizers in the Western North American agricultural market, sold through agricultural fertilizer dealers who resell to growers. The principal products manufactured and distributed are phosphoric acid, ammonium nitrogen products, urea ammonium nitrate solutions, and homogeneous N-P-K fertilizers. J.R. Simplot Co. has attained a major share of the agricultural fertilizer market in the Western United States and in Canada.

The Professional Products business unit (3.5 percent of MCG's 1992 revenues) develops and markets fertilizers and chemicals for use in the maintenance of turf grasses and ornamentals. The Feed Phosphates business unit (1.7 percent of MCG's 1992 revenues) markets feed-grade phosphates that serve the needs of the poultry

and livestock industries of Western North America.  The Industrial Chemical business unit (2.2 percent of MCG's 1992 revenues) markets ammonia and phosphates used in different nonagricultural applications.  The Consumer Products business unit (1 percent of MCG's 1992 revenues) produces and markets fertilizers for home and garden use, mainly in the Western United States and Hawaii.

MCG operates four fertilizer manufacturing plants in Idaho, California, and Manitoba, Canada.  The largest facilities are the Smoky Canyon Mine (near the Idaho-Wyoming border) and the Don Manufacturing complex (west of Pocatello, Idaho).

In the beginning of fiscal year 1992, J.R. Simplot Co. purchased Chevron's fertilizer manufacturing operations.

MCG also operates a silica sand operation in Overton, Nevada, and an agricultural chemical formulating plant in Mountain Home, Idaho.

J.R. Simplot Co. has been isolated from the pressures of other U.S. fertilizer producers, mainly located in the Southeast.  MCG sells most of its fertilizer in inland markets, where access to other producers by land or water via the west coast is expensive. MCG sells more than 20 percent of its output in Idaho and 85 percent of its sales in protected markets west of the Rockies.

5.  Development and Corporate (Administrative) Group

J.R. Simplot Co., through DCG, owns other agribusiness ventures, including three cheese plants (e.g., Arpin Dairy, Inc., in Arpin, Wisconsin; Swiss Village Cheese Co., in Nampa, Idaho; and Washington Farms Distribution, Inc., in Mount Vernon, Washington).

DCG controls the operation of a hydroelectric plant, land development, Simplot International (primarily in Hungary, Poland, and Argentina), and former aquaculture operations that now grow produce, such as tomatoes. For the 9 months ended May 31, 1993, DCG had combined gross revenues of approximately $2.5 million.

C.  Equity Investment

In addition to its operating assets, as of the valuation date J.R. Simplot Co. held 5,259,800 shares of Micron Technology, Inc. (Micron Technology), common stock. This interest represented 13.36 percent of the shares of Micron Technology common stock outstanding.

Micron Technology manufactures and markets semiconductor memory components and personal computers. It has operations that directly or indirectly serve the computer, telecommunications, and office automation industries. It competes in the manufacturing and marketing of semiconductor memory components, the production of memory-intensive modules and board-level products, the assembly and selling of IBM-compatible personal computers, and the design and development of new technologies relating to fueled emission flat panel displays.

The shares of Micron Technology stock are traded on the New York Stock Exchange. On decedent's date of death, shares of Micron Technology stock were trading at $34.63 (the mean between the high and low selling price per share of Micron Technology on the New York Stock Exchange); the closing price was $34.875 per share.

D.  Capital Structure

As of June 24, 1993, J.R. Simplot Co. had two classes of authorized stock: Class A common voting and class B common nonvoting stock.

As of June 24, 1993, J.R. Simplot Co. had 141,365.029 shares of outstanding stock: 76.445 shares of class A voting stock and 141,288.584 shares of class B nonvoting stock.  The stock of J.R. Simplot Co. was owned as follows:

CLASS A VOTING STOCK

| Stockholder | Number of Shares | Percent of Total |
|---|---|---|
| Decedent | 18.000 | 23.55% |
| Don | 18.000 | 23.55 |
| Gay | 18.000 | 23.55 |
| Scott | 22.445 | 29.35 |
| Total | 76.445 | 100.00 |

CLASS B NONVOTING STOCK

| Stockholder | Number of Shares | Percent of Total |
|---|---|---|
| Decedent | 3,942.048 | 2.79% |
| Don | 4,292.454 | 3.04 |
| Gay | 4,406.403 | 3.12 |
| Scott | 7,978.446 | 5.65 |
| Trust--decedent's family | 28,909.342 | 20.46 |
| Trust--Don's family | 24,997.252 | 17.69 |
| Trust--decedent's and Don's family | 34,826.391 | 24.65 |
| Other Simplot family and affiliates | 27,042.707 | 19.14 |
| ESOP | 4,893.541 | 3.46 |
| Total | 141,288.584 | 100.00 |

Each share of class A voting stock is entitled to one vote.

Both class A voting and class B nonvoting shareholders are entitled to the same dividends (without preference) on a per-share basis, if and when declared by the board of directors of J.R. Simplot Co. As of the date of decedent's death, J.R. Simplot Co. had never declared a dividend.

Pursuant to J.R. Simplot Co.'s articles of incorporation, upon liquidation of J.R. Simplot Co., the Company's assets are to be used in the following order of priority: (1) Payment of all outstanding indebtedness; (2) payment to the class B nonvoting shareholders in an amount equal to the par value of their shares ($10 per share) plus a dividend equal to 40 cents per share for each year that the stock is outstanding after July 1, 1955, up to the last day of the February preceding the liquidation date; (3) payment to the class A voting shareholders in an amount equal to the par value of their shares ($10 per share); and (4) payment of the balance to all class A voting and class B nonvoting shareholders pro rata on a per-share basis.

The articles of incorporation and the bylaws of J.R. Simplot Co. place a 360-day restriction on the transferability or hypothecation of the class A voting stock. Pursuant to this restriction, if a class A voting shareholder desires to sell, transfer, or hypothecate his/her class A voting stock, the stock must be first offered to the Company under the same terms and conditions as otherwise could be obtained by the selling shareholder from another purchaser or lender for a period of 180 days. If the Company declines to exercise its right during this

180-day period, then the other class A voting shareholders (as a group) have an additional 180 days within which to purchase the stock.

Before June 23, 1993, class B nonvoting shareholders were afforded a nominal level of liquidity for their shares through sales to J.R. Simplot Co.'s ESOP as well as occasional ad hoc redemptions of the shares by the Company.  In substantially all instances, the price paid for these repurchases occurred at the most recent ESOP valuations prepared by Morgan Stanley & Co., Inc. (Morgan Stanley).

As a practical matter, before June 23, 1993, J.R. Simplot set the amounts of compensation paid by the Company to his children. The amounts paid from 1991 to 1993 were as follows:

| Officers/Directors | 1991 | 1992 | 1993 |
|---|---|---|---|
| Don | $246,385.76 | $314,628.71 | $235,972.26 |
| Scott | 122,301.44 | 17,140.00 | --- |
| Decedent | 222,730.14 | 200,801.14 | 79,785.42 |
| Gay | --- | --- | --- |

Before divorce, Gay's spouse received compensation in his management capacity from J.R. Simplot Co.

J.R. Simplot Co. owned resort properties in Ketchum and McCall, Idaho; it also owned a corporate aircraft.  Simplot family members were permitted to use these facilities for nonbusiness purposes, on a space-available basis (and did so).  Simplot family members were permitted to use the corporate aircraft for personal purposes at rates below those available on commercial flights.

Additionally, J.R. Simplot Co. paid club membership fees of various Simplot family members.

Several partnerships, joint ventures, and companies owned by J.R. Simplot Co.'s class A voting shareholders were created in conjunction with J.R. Simplot Co.'s businesses. These entities did all or substantially all of their business with J.R. Simplot Co. As of the valuation date, these entities owned, among other things, food storage facilities, office buildings, livestock, agricultural and development real estate, and grazing rights (see supra note 1).

E. Management

As of the valuation date, J.R. Simplot Co.'s management structure was as follows:

| Name | Position |
|------|----------|
| J.R. Simplot | Chairman |
| Gordon C. Smith | President and chief executive officer |
| Lawrence E. Costello | Vice president of finance and chief financial officer |
| James D. Crawford | Corporate treasurer |
| Stephen A. Beebe | President of the Food Products Group |
| Donald D. Pottinger | President of the Minerals and Chemical Group |
| Tom Basabe | President of the Agricultural Group |
| Ray G. Kaufman | President of the Diversified Products Group |
| Ronald N. Graves | General counsel and corporate secretary |

Nonfamily members have served on the board of directors for several decades.

In 1993, there was a change in both the chairmanship and presidency of J.R. Simplot Co. J.R. Simplot retired as chairman of the Company, and thereafter an office of the chairman, composed of Don, Gay, Scott, and decedent's son, was established.

While J.R. Simplot was on the board of directors, the other board members usually adhered to his business and policy decisions. Although J.R. Simplot's four children had independent views regarding how the family business should be run, there was unanimity in their philosophy to maintain J.R. Simplot Co. as a private, family-owned company.

F.  Contingent Environmental Liabilities

As of the valuation date, J.R. Simplot Co. had potential environmental liabilities estimated to be at a maximum of $95 million.

G.  Financial History

The consolidated balance sheets for J.R. Simplot Co. and subsidiaries for their fiscal years ended August 31, 1991, 1992, and 1993, reveal:

J.R. SIMPLOT COMPANY & SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
AUG. 31, 1993, 1992 and 1991
(in thousands)

| ASSETS | 1993 | 1992 | 1991 |
|---|---|---|---|
| CURRENT ASSETS | | | |
| Cash and equivalents | $20,920 | $22,366 | $15,457 |
| Notes & accounts receivable, less allowances | 206,398 | 187,935 | 164,285 |
| Inventories | 197,022 | 170,449 | 233,164 |
| Manufacturing supplies | 23,244 | 22,591 | 23,268 |
| Prepaid expenses & other assets | 15,739 | 15,487 | 16,086 |
| Total current assets | 463,323 | 418,828 | 452,260 |
| INVESTMENTS & OTHER ASSETS | | | |
| Amounts due from affiliates | 32,810 | 36,488 | 10,000 |
| Investments | 128,543 | 110,718 | 102,941 |
| Other assets | 38,624 | 27,554 | 31,712 |
| PROPERTY & EQUIPMENT, net | 559,310 | 523,908 | 493,988 |
| | 1,222,610 | 1,117,496 | 1,090,901 |

LIABILITIES & SHAREHOLDERS' EQUITY

| | | | |
|---|---|---|---|
| CURRENT LIABILITIES | | | |
| Accounts payable & accrued | | | |
| expenses | $223,024 | $193,987 | $174,058 |
| Income taxes payable | 1,592 | 775 | 917 |
| Long-term debt, current portion | 3,440 | 4,126 | 2,571 |
| Total current liabilities | 228,056 | 198,888 | 177,546 |
| LONG-TERM DEBT, less current portion | 433,924 | 380,921 | 382,554 |
| OTHER LIABILITIES & DEFERRED CREDITS | 15,375 | 14,495 | 21,283 |
| DEFERRED INCOME TAXES | 54,350 | 61,694 | 62,734 |
| | 731,705 | 655,998 | 644,117 |
| SHAREHOLDERS' EQUITY | | | |
| Class A capital stock, voting, | | | |
| $10 par value, authorized 100 | | | |
| shares, issued 76.445 shares | 1 | 1 | 1 |
| Class B capital stock, nonvoting, | | | |
| $10 par value, authorized 249,900 | | | |
| shares, issued 161,310.269 shares | 1,313 | 1,324 | 1,336 |
| Additional paid-in capital | 6,931 | 6,931 | 6,931 |
| Retained Earnings | 482,660 | 453,242 | 438,516 |
| | 490,905 | 461,498 | 446,784 |
| | 1,222,610 | 1,117,496 | 1,090,901 |

The consolidated statements of cash-flow for J.R. Simplot Co. and subsidiaries for their fiscal years ended August 31, 1991, 1992, and 1993, reveal:

J.R. SIMPLOT COMPANY & SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
YEARS ENDED AUG. 31, 1993, 1992 and 1991
(in thousands)

| | 1993 | 1992 | 1991 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net Income | $37,825 | $20,545 | $5,281 |
| Adjustments to reconcile net income | | | |
| to net cash provided by operating | | | |
| activities: | | | |
| Depreciation | 52,600 | 62,129 | 58,319 |
| Deferred income taxes | (6,089) | 580 | (2,671) |
| Equity investment earnings | (16,378) | (119) | (3,112) |
| Other items, net | 6,842 | 14 | 4,190 |
| Changes in assets & liabilities: | | | |
| Notes & accounts receivable, | | | |
| net | (22,771) | (23,940) | (2,784) |
| Inventories | (27,335) | 63,437 | 13,180 |

| | | | |
|---|---|---|---|
| Accounts payable & accrued expenses | $26,173 | $12,252 | $7,228 |
| Other liabilities & deferred credits | (877) | (2,404) | (2,166) |
| Other assets & liabilities, net | (313) | 1,849 | (10) |
| **NET CASH PROVIDED BY OPERATING ACTIVITIES** | 49,677 | 134,343 | 77,455 |
| **CASH-FLOWS FROM INVESTING ACTIVITIES** | | | |
| Capital expenditures | (101,328) | (87,359) | (74,580) |
| Proceeds from sale of property & equipment | 2,042 | 7,260 | 6,766 |
| Investments | (111) | (11,185) | (2,319) |
| Change in amounts due to/from affiliates | 1,279 | (27,728) | (2,571) |
| **NET CASH USED FOR INVESTING ACTIVITIES** | (98,118) | (119,012) | (72,704) |
| **CASH-FLOWS FROM FINANCING ACTIVITIES** | | | |
| Long-term debt proceeds | 100,000 | 112,989 | 40,511 |
| Long-term debt repayments | (52,121) | (120,140) | (41,888) |
| Purchase of Treasury stock | (884) | (1,271) | (1,638) |
| **NET CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES** | 46,995 | (8,422) | (3,015) |
| **NET CHANGE IN CASH & EQUIVALENTS** | (1,446) | 6,909 | 1,736 |
| CASH & EQUIVALENTS, beginning of year | 22,366 | 15,457 | 13,721 |
| CASH & EQUIVALENTS, end of year | 20,920 | 22,366 | 15,457 |
| **SUPPLEMENTAL DISCLOSURE OF CASH-FLOW INFORMATION** | | | |
| Income taxes paid | 11,023 | 8,273 | 1,414 |
| Interest paid, net of amount capitalized | 32,083 | 27,134 | 37,171 |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH INVESTING & FINANCING ACTIVITIES** | | | |
| Asset acquisitions through assumption of liabilities | 13,292 | 19,719 | 10,087 |
| Asset acquisitions for noncash consideration | 4,406 | --- | --- |
| Exchange of receivables for stock | 895 | 1,250 | 650 |
| Exchange of inventory for noncash consideration | --- | 4,400 | 4,435 |

## H.  Industry Conditions and J.R. Simplot Co.'s Prospects

Between 1983 and 1993, J.R. Simplot Co. began facing a number of stronger competitors, such as Lamb-Weston, Ore-Ida, and Universal Foods.  (The trend involved large companies such as Ore-Ida Foods purchasing a small potato plant; subsequently, Ore-Ida

Foods sold out to H.J. Heinz.) Moreover, the opening up of the Canadian market through the North American Free Trade Act brought Canadian companies into competition with J.R. Simplot Co. Through acquisitions, mergers, and growth, J.R. Simplot Co.'s competitors were becoming larger and better financed.

As of June 1993, the processed and frozen vegetable industries appeared to be rebounding from a 3-year recession. Record crops and the resulting high inventory levels were showing signs of abatement, and frozen vegetables were expected to recover some of the sales lost to fresh vegetables because of the decrease in fresh vegetable prices.

Total U.S. nutrient consumption in 1993 was projected at 20 million short tons, down 4 percent from 1992. Nitrogen was projected at approximately 11 million tons, down more than 4 percent from 1992; phosphates at 4 million tons, down more than 2 percent; and potash 5 million tons, down 4 percent.

In June 1993, the chemicals and fertilizer industry was operating at full capacity. It was expected that the industry would continue to operate at full capacity with slow to moderate growth over the next several years.

As of June 1993, J.R. Simplot's near-term prospects were good. The Company's operating and capital budget for fiscal year 1994 projected that the anticipated shareholders' equity of the Company would increase by 7.22 percent between August 31, 1993 and 1994. In 1993, the Company projected 1994 fiscal year net revenues to be $1,965,022,000 and net income to be $36,104,000. J.R. Simplot

Co.'s 5-year strategic business plan also projected a favorable outlook for the Company.

Both before and after the valuation date, several of J.R. Simplot Co.'s competitors had inquired into whether the Company or parts of the Company might be available for acquisition.

I.  Decedent's Last Will and Testament

Pursuant to the terms of his will, executed on July 13, 1988, decedent bequeathed to the trustees of a testamentary trust for the benefit of his children (the credit shelter trust) all of his J.R. Simplot Co. class A voting stock plus that amount of class B nonvoting stock which, when added to the voting stock (as valued for Federal estate tax purposes), equaled the Federal estate tax return filing requirement amount in effect at the time of his death (i.e., $600,000), reduced by the aggregate amount of any adjusted taxable gifts (as defined in section 2001(b)) made by him after December 31, 1976.  The balance of decedent's estate, including the remaining class B nonvoting shares owned by decedent, passed to decedent's surviving spouse, Adelia Ann Simplot.

Federal estate tax due from decedent's estate is to be paid out of that portion of the estate which is to otherwise pass to decedent's surviving spouse.  All State transfer and inheritance taxes due with respect to a bequest are treated as a charge against the distributive share of the person receiving the bequest.

J.  U.S. Estate Tax Return

In September 1994, petitioner filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, that listed

among other assets, 18 shares of class A voting stock and 3,942.048 shares of class B nonvoting stock of J.R. Simplot Co. The fair market value for both the class A voting shares and class B nonvoting shares owned by decedent on the date of his death was reported at $2,650 per share. (Accordingly, the aggregate fair market value of the 18 class A voting shares was reported at $47,700, and the aggregate fair market value of the 3,942.048 class B nonvoting shares at $10,446,427.) This valuation was based upon an appraisal by Morgan Stanley, dated December 9, 1993.

The total number of outstanding shares of J.R. Simplot Co. used by Morgan Stanley in its appraisal erroneously included treasury shares held by J.R. Simplot Co. Using the correct number of shares outstanding, and the same methodology Morgan Stanley employed, the fair market value of decedent's class A voting and class B nonvoting shares of J.R. Simplot Co. would have been approximately $3,025 per share (in lieu of $2,650 per share as reported).

K.  Notice of Deficiency

Respondent issued a notice of deficiency to petitioner, dated September 9, 1997, determining an estate tax deficiency of $17,643,886 and penalties of $7,057,554, pursuant to section 6662(a), (g), (h)(1), and (2)(C). The deficiency and penalties are primarily based upon respondent's redetermination of the value of the 18 shares of class A voting and 3,942.048 shares of class B nonvoting stock of J.R. Simplot Co. owned by decedent on the date of his death. Respondent increased the value for the 18 shares of

class A voting stock from the reported $47,700 (or $2,650 per share) to $14,435,907 (or $801,994.83 per share) and increased the value for the 3,942.048 class B nonvoting stock from the reported $10,446,427 (or $2,650 per share) to $14,134,213 (or $3,585.50 per share).    These values resulted in the following determined increases to decedent's gross estate:

|  | Amount reported by the estate | Amount determined by respondent | Increases to gross estate |
|---|---|---|---|
| 18 shares of class A voting shares | $47,700 | $14,435,907 | $14,388,207 |
| 3,942.048 shares of class B nonvoting shares | 10,446,427 | 14,134,213 | 3,687,786 |
| Total disputed increases |  |  | 18,075,993 |

On brief, respondent concedes that the values of decedent's class A and class B shares do not exceed $11,090,094 and $13,887,007, respectively.

In addition, respondent decreased the amount of the marital deduction from the reported $15,127,237 to $1,723,437, because of (1) respondent's redetermination of the fair market value of the class A voting stock and (2) the resulting estate tax consequences which are to be borne by that portion of the estate (the residue) passing to decedent's surviving spouse.  And finally, respondent determined that petitioner is liable for $7,057,554 in penalties pursuant to section 6662(a), (g), (h)(1) and (2)(C).

ULTIMATE FINDINGS OF FACT

1.   The class A voting stock is to be accorded a premium for its voting privileges.  After giving consideration to the premium for the voting privileges, and after applying a 35-percent marketability (lack of liquidity) discount, the fair market value of decedent's class A voting stock was $215,539.01 per share or a total of $3,879,702.19, on the valuation date.

2.   After applying a 40-percent marketability (lack of liquidity) discount, the fair market value of decedent's class B nonvoting stock was $3,417.05 per share or a total of $13,470,190.88, on the valuation date.[3]

3.   Because there has been no payment of State transfer or inheritance taxes, respondent correctly did not include in the computation of the amount of the marital deduction (and in the computation of the asserted estate tax deficiency) an allowance for State transfer or inheritance taxes paid.

4.   Petitioner acted reasonably and in good faith in relying on the advice of tax professionals and appraisers in valuing decedent's class A voting stock and class B nonvoting stock for Federal estate tax purposes.

---

[3]   In arriving at the valuations in Ultimate Findings of Fact Nos. 1 and 2, we did not consider certain exhibits (Exs. 22-J, 30-R, 41-J, 42-J, 43-J, 44-J, 45-J, 46-J, 121-P, 124-P, 125-P, 126-P, 127-P, and 128-P) that the parties objected to in the stipulations of facts.  These documents are not probative and accordingly have been accorded no weight.

OPINION

Issues 1 and 2.  Valuation of J.R. Simplot Co. Stock

Our fundamental task is to determine the fair market value of 18 shares of class A voting stock and 3,942.048 shares of class B nonvoting stock in J.R. Simplot Co. owned by decedent at the time of his death.  In performing this task, we must decide whether under the facts and circumstances presented, a premium should be accorded to the voting privileges of the class A voting stock and, if so, the amount of that premium.  Petitioner took the position that no premium should be given to the voting privileges of the class A stock and thus in the estate tax return valued both the class A voting stock and class B nonvoting stock at $2,650 per share, or an aggregate fair market value of $47,700 for the class A voting stock and $10,446,427 for the class B nonvoting stock.  On the other hand, respondent asserts that the class A voting stock is entitled to a premium for voting privileges and in the statutory notice of deficiency determined an $801,994.83 per-share value for the class A voting stock, for a total value held by decedent in that class of $14,435,907, and a $3,585.50 per-share value for the class B nonvoting stock, for a total value held by decedent in that class of $14,134,213.  On brief, respondent concedes that the values of decedent's class A and class B shares do not exceed $11,090,094 and $13,887,007, respectively.

It is well settled that a presumption of correctness attaches to respondent's notice of deficiency.  See Helvering v. Taylor, 293 U.S. 507, 515 (1935); Cohen v. Commissioner, 266 F.2d 5, 11-12 (9th

Cir. 1959). Petitioner has the burden of showing that respondent's valuation determinations as set forth in the notice of deficiency are incorrect. See, e.g., Leonard Pipeline Contractors, Ltd. v. Commissioner, 142 F.3d 1133, 1136 (9th Cir. 1998). "This burden is a burden of persuasion; it requires * * * [petitioner] to show the merits of [its] claim by at least a preponderance of the evidence." Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). In addition to initially overcoming the "procedural burden of producing evidence to rebut the presumption in favor of the Commissioner, the taxpayer must still carry his ultimate burden of proof or persuasion." Rockwell v. Commissioner, supra at 885.

Here, we find, and thus hold, that petitioner has produced sufficient evidence to overcome the presumption of correctness attached to respondent's notice of deficiency valuation determinations.[4] However, this does not mean that we subscribe to petitioner's reported valuations, for as will be further explained, we do not.

Petitioner frames the ultimate valuation issue to be resolved as "What was the fair market value of the Decedent's 2.8% minority equity interest in Simplot as of June 24, 1993, represented by the

---

[4] The U.S. Court of Appeals for the Ninth Circuit stated: "When the Commissioner's determination has been shown to be invalid, the Tax Court must redetermine the deficiency. The presumption as to the correctness of the Commissioner's determination is then out of the case." Cohen v. Commissioner, 266 F.2d 5, 11 (9th Cir. 1959), remanding T.C. Memo. 1957-172 (fn. ref. omitted).

Decedent's 18 minority Class A voting shares and 3,942.048 minority Class B nonvoting shares?".  We disagree with this framing of the ultimate valuation issue before us.  The valuation of a single class of stock in J.R. Simplot Co. is not before us.  Rather, we must determine the value of decedent's interest in two distinct classes of stock:  Class A voting stock and class B nonvoting stock of J.R. Simplot Co. The class A voting stock represents a significant percentage (23.55 percent) of the total outstanding voting stock of the Company.  Although decedent's class A voting stock represents a minority interest, it is sizable nonetheless, and except for Scott's 29.35-percent interest in the voting stock of J.R. Simplot Co., there is no other block of voting stock larger than that of decedent.  The class A voting stock should not, in our opinion, be combined and valued with the class B nonvoting stock.

Petitioner further asserts that the fair market values of the J.R. Simplot Co. class A voting and class B nonvoting stock are identical--$2,964.10 per share.  According to petitioner, because decedent's class A voting shares do not represent voting control, they are effectively equivalent to class B nonvoting shares and are entitled to no or only a negligible premium for voting. In petitioner's view, noncontrol voting and nonvoting shares are "functionally equivalent" because no economic benefits were available to class A vis-a-vis class B shareholders, and there was no reasonable expectation that disproportionate economic benefits would be available to the class A shareholders in the foreseeable future.  Indeed, petitioner's experts opined that the 360-day

restriction placed on the transferability of the class A voting shares, as contrasted to the nonrestricted transferability of the class B nonvoting stock, plus the liquidation preferences provided to the class B nonvoting stock, made the class B nonvoting stock as valuable as or more valuable than the class A voting stock.

On the other hand, respondent contends that a voting privilege premium should be given to the class A stock and that because of the disparate ratio (or skewed distribution) between the number of shares of voting stock outstanding and the number of shares of nonvoting stock outstanding (1 to 1,848), the premium should be expressed as a percentage of (or in relation to) the equity value of J.R. Simplot Co.[5]  For the reasons that follow, we agree with respondent.

The applicable statutory law, section 2031(a), requires the "gross estate" of decedent to be determined for Federal estate tax purposes "by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."  The standard for valuation is fair market value, which

---

[5]  As used by the experts, the term "equity value" means J.R. Simplot Co's. enterprise value plus cash minus debt.  In determining J.R. Simplot Co.'s enterprise value, the experts first valued the Company, exclusive of its Micron Technology investment, using both an income and a market approach.  The value of the Company's Micron Technology investment was then determined and added to the average of the values determined for the Company under the income and market approaches.

We are mindful that this meaning of the term "equity value" differs from that as used by accountants (namely, assets minus liabilities of the Company).  Herein, we use the experts' meaning, rather than the accountant's meaning, of the term "equity value".

is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 550 (1973); Collins v. Commissioner, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo. 1992-478; sec. 20.2031-1(b), Estate Tax Regs.  The standard is objective, using a purely hypothetical willing buyer and willing seller, each of whom would seek to maximize his or her profit from any transaction involving the property.  See Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).  The hypothetical persons are not specific individuals or entities, and their characteristics are not necessarily the same as the personal characteristics of the actual seller or a particular buyer. See Propstra v. United States, supra; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Kolom v. Commissioner, 71 T.C. 235, 244 (1978), affd. 644 F.2d 1282 (9th Cir. 1981). However, the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect value. See Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982).

Valuation of property for tax purposes is a question of fact; all facts and circumstances are to be examined on the date of valuation without regard to hindsight.  See, e.g., Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo.

1961-347; <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 423-424 (1993); <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 217; sec. 20.2031-1(b), Estate Tax Regs. However, future events that were reasonably foreseeable at the valuation date may be considered in determining fair market value. See <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 218; <u>Estate of Gilford v. Commissioner</u>, <u>supra</u> at 52; <u>Gray v. Commissioner</u>, 2 B.T.A. 672, 682 (1925); <u>Estate of Livermore v. Commissioner</u>, T.C. Memo. 1988-503. The Court has broad discretion to determine which facts are most important in reaching a determination because "finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation." <u>Colonial Fabrics, Inc. v. Commissioner</u>, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.

Determining fair market value of unlisted stock (such as J.R. Simplot Co. stock) is, to say the least, difficult. Citing <u>Alvary v. United States</u>, 302 F.2d 790, 795 (2d Cir. 1962), petitioner admitted on brief that there is some "inherent inexactness of the concept of fair market value". Here, our task is exacerbated as a consequence of the skewed ratio of outstanding voting shares (76.445) to nonvoting shares (141,288.584) in J.R. Simplot Co.'s capital structure.

An actual arm's-length sale of unlisted stock in the normal course of business within a reasonable time before or after the valuation date is the best evidence of fair market value. See <u>Estate of Andrews v. Commissioner</u>, <u>supra</u> at 940; <u>Estate of Campbell</u>

v. Commissioner, T.C. Memo. 1991-615; sec. 20.2031-2(b), Estate Tax Regs. In the absence of such an arm's-length sale, in valuing unlisted stock we often look to the value of publicly traded stock of corporations engaged in similar lines of business. See sec. 2031(b); Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989). Factors relevant in valuing stock in closely held corporations include:

    (a)  The nature of the business and the history of the enterprise from its inception.

    (b)  The economic outlook in general and the condition and outlook of the specific industry in particular.

    (c)  The book value of the stock and the financial condition of the business.

    (d)  The earning capacity of the company.

    (e)  The dividend-paying capacity [of the company].

    (f)  Whether or not the enterprise has goodwill or other intangible value.

    (g)  * * * the size of the block of stock to be valued. [and]

    (h)  The market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239; see also sec. 20.2031-2(f)(2), Estate Tax Regs.

    This revenue ruling "has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value". Estate of Newhouse v. Commissioner, supra at 217. Nevertheless, these factors cannot be applied with mathematical precision. See Rev. Rul. 59-60, supra, 1959-1 C.B. at 238. As the

trier of fact, we have broad discretion in assigning the weight to accord to the various factors and in selecting the method of valuation. Estate of O'Connell v. Commissioner, 640 F.2d 249, 251-252 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191. In reaching our ultimate valuation conclusions, we have considered and given the weight we deem appropriate to these factors.

In valuing stock in closely held corporations, discounts are usually warranted. A discount for lack of marketability may apply to minority interests in closely held corporations because a ready market for shares in the corporations does not exist. See, e.g., Estate of Jung v. Commissioner, supra; Estate of Jameson v. Commissioner, T.C. Memo. 1999-43; Estate of Furman v. Commissioner, T.C. Memo. 1998-157; Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996); Estate of Lauder v. Commissioner, T.C. Memo. 1992-736; Estate of Andrews v. Commissioner, supra at 953.

In several instances, courts have held that hypothetical buyers will pay a premium for shares with voting privileges or conversely apply a discount for nonvoting stock. See Barnes v. Commissioner, T.C. Memo. 1998-413 (a 3.66-percent discount was applied for nonvoting stock); Kosman v. Commissioner, T.C. Memo. 1996-112 (a 4-percent discount was applied for nonvoting stock); Estate of Winkler v. Commissioner, T.C. Memo. 1989-231 (voting shares accorded a 10-percent premium); Wallace v. United States, 566 F. Supp. 904, 917 (D. Mass. 1981) (voting shares accorded a 5-

percent premium). In <u>Wallace</u>, a premium for voting shares was calculated as a percentage of total equity value, rather than as a percentage of nonvoting shares. Further, courts have found wide disparities in value between voting and nonvoting shares, even where the economic rights to dividends and liquidation proceeds do not favor the voting shareholders. See <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. at 248-249 (each voting share worth approximately $350,000 more per share than a nonvoting share even though voting shareholders had no economic advantage in dividends or liquidation).

Both parties relied upon experts' valuations in order to demonstrate the correct value of the stock at issue. The difference in amounts arrived at by the experts is extreme.

At times expert testimony aids the Court in determining valuation; in other instances, it does not. See <u>Laureys v. Commissioner</u>, 92 T.C. 101, 129 (1989). We weigh the testimony in light of the expert's qualifications as well as other credible evidence. See <u>Estate of Christ v. Commissioner</u>, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We have broad discretion to evaluate "'the overall cogency of each expert's analysis'". <u>Sammons v. Commissioner</u>, 838 F.2d 330, 333 (9th Cir. 1988) (quoting <u>Ebben v. Commissioner</u>, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part on another issue T.C. Memo. 1983-200), affg. in part and revg. in part T.C. Memo. 1986-318. We are not bound by the formulas and opinions offered by an expert, especially when they are contrary to our judgment. See <u>Estate of</u>

Newhouse v. Commissioner, supra at 217; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Instead, we may reach a decision as to the value of the property based on our own analysis of all the evidence in the record, see Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, 325 F.2d at 941, using all of one party's expert opinion, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or selectively using any portion of such an opinion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986). We have broad discretion in selecting valuation methods, see Estate of O'Connell v. Commissioner, supra at 251, and in ascertaining the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", Colonial Fabrics, Inc. v. Commissioner, 202 F.2d at 107. Finally, because valuation necessarily results in an approximation, the figure at which we arrive need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence. See Silverman v. Commissioner, supra at 933.

A. Valuations of Petitioner's Experts

1. Paul J. Much

Petitioner's first expert, Paul J. Much, is senior managing director of Houlihan Lokey Howard & Zukin, an investment banking firm. He valued both the class A voting shares and class B nonvoting shares at $2,964.10 per share on a nonmarketable minority-interest basis as of the valuation date.

In his expert witness report, Mr. Much stated that the valuation of decedent's holdings in J.R. Simplot Co. on a per-share basis requires an initial determination of the enterprise and net equity value of J.R. Simplot Co. In this regard, he considered the value of J.R. Simplot Co.'s business operations and the value of its nonoperating assets (its 13.36-percent ownership in Micron Technology), as well as whether any difference exists, on a per-share basis, between the class A voting and class B nonvoting shares.

In determining a value for J.R. Simplot Co., Mr. Much examined the following factors: The Company's history, economic growth, financial condition, and earning capacity; the amount (if any) of dividends paid; the value of the Company's tangible and intangible assets; prior sales of the Company's stock to similar companies; and restrictions placed on the stock of the Company. He considered both historical and projected earnings of J.R. Simplot Co.'s operating divisions, using a market capitalization approach (which applies market-related pricing ratios of comparable publicly traded companies to the performance measures of each of the Company's operating divisions) and by doing so arrived at an enterprise value for J.R. Simplot Co. of $1,066,740,000. He also used a discounted cash-flow approach (DCF) (which estimates the present value of the projected future operating cash-flows generated from the business of the Company) and by doing so arrived at an $1,079,900,000 enterprise value. (In arriving at J.R. Simplot Co.'s enterprise value through the use of both these approaches, Mr. Much gave no

consideration to the Company's liabilities, cash, and nonoperating assets (i.e., the Micron Technology stock).) Mr. Much then averaged the values obtained under these two approaches and concluded that the appropriate enterprise value for J.R. Simplot Co. as of the valuation date was $1,073,320,000.

In using the market capitalization approach, Mr. Much examined seven comparable public companies[6] and concluded that J.R. Simplot Co.'s "Food Division" (consisting of FPG, AG, and DPG) is similar to the comparable companies in terms of revenues, total assets, activity, and liquidity. However, he concluded that the Food Division was less profitable than the comparable companies and was highly dependent upon McDonald's for a large portion of its annual revenue, presenting a risk to which the comparable companies were not exposed. Applying the total invested capital (TIC) multiples (including earnings before interest and taxes (EBIT) and earnings before interest, taxes, depreciation, and amortization (EBITDA)), Mr. Much determined the TIC value of J.R. Simplot Co.'s Food Division to be $492,470,000.

Mr. Much performed a similar analysis with regard to J.R. Simplot Co.'s Fertilizer Division (consisting of MCG), selecting four public companies for comparison purposes (IMC Global, Inc., Potash Corp. of Saskatchewan, Inc., Terra Industries, Inc., and Vigoro Corp.). After comparing the quantitative factors of the

---

[6] Mr. Much selected the following companies for comparison purposes: ConAgra, Inc., Dean Foods Co., Flowers Industries, Inc., Hormel Foods Corp., International Multifoods Corp., Tyson Foods, Inc., and Universal Foods Corp.

Fertilizer Division with those of the four comparable companies, Mr. Much concluded that, taken as a whole, the Fertilizer Division operations "represent a similar investment risk, for a given return", as the public fertilizer comparables as a group. Applying his TIC/EBIT and TIC/EBITDA multiples, he determined the TIC value of J.R. Simplot Co.'s Fertilizer Division as $574,270,000 (using a market capitalization approach).

Following his comparative companies analysis, Mr. Much turned to a DCF analysis to value J.R. Simplot Co.: (1) Determination of the appropriate cash-flows to discount, based upon J.R. Simplot Co.'s projected income statements and balance sheets; (2) selection of a discount rate for J.R. Simplot Co. projections, based upon an analysis of alternative investments (including public company discount rates); (3) determination of a terminal value for J.R. Simplot Co., as of the end of the last period for which projections were available; and (4) determination of TIC value for J.R. Simplot Co.

In determining the free cash-flows, Mr. Much concluded that J.R. Simplot Co. had a revenue growth rate of 8.5 percent and an EBIT margin of 4.5 percent based on historical performance. He then applied a 10- to 12-percent discount rate, concluding that the TIC value of the Food Division was between $481,100,000 and $575,880,000, or $522,780,000 using an 11-percent discount rate.

In a similar manner, Mr. Much determined a 7.5- to 9.5-percent discount rate with regard to the Fertilizer Division. He concluded that using the discounted cash-flow approach, the TIC value of the

Fertilizer Division was between $493,590,000 and $648,610,000, or $557,120,000 using an 8.5-percent discount rate.[7]

Next, Mr. Much valued J.R. Simplot Co.'s investment in Micron Technology, a nonoperating asset. Considering that J.R. Simplot Co. is an "affiliate" of Micron Technology under the Securities Exchange Act of 1933 (rendering any sale of J.R. Simplot Co.'s Micron Technology shares subject to certain restrictions under Securities and Exchange Commission rule 144),[8] Mr. Much concluded that a year (based on approximately 250 trading days per year) or more would be required for J.R. Simplot Co. to sell its Micron Technology shares through normal market channels, assuming that the shares are sold on each available day (subject to Micron

---

[7] The following summarizes Mr. Much's TIC conclusions regarding the Food and Fertilizer Divisions (before considering the value of nonoperating assets and liabilities):

Market Capitalization Method

| | |
|---|---|
| Food Division | $492,470,000 |
| Fertilizer Division | 574,270,000 |
| J.R. Simplot Co. Consolidated | 1,066,740,000 |

Discounted Cash Flow Method

| | |
|---|---|
| Food Division | $522,780,000 |
| Fertilizer Division | 557,120,000 |
| J.R. Simplot Co. Consolidated | 1,079,900,000 |

[8] As of June 24, 1993, John R. Simplot, Don J. Simplot, and Gordon C. Smith, all J.R. Simplot Co. officers, were also members of Micron Technology's board of directors, and J.R. Simplot Co. owned more than 10 percent of Micron Technology's common stock.

Technology's "blackout" policy[9]) and that the sale of stock constitutes 15 to 25 percent of daily trading volume.

Mr. Much also considered "blockage" (referring to the market's ability to absorb an individual block of stock without an adverse impact on the market price), analyzing block trades between June 27, 1989, and April 16, 1993, the length of the holding period, blackout restrictions, and the relative size of the block; he concluded that a 5-percent blockage discount was appropriate. Moreover, he took into account the transaction costs (estimated to be $500,000) necessary to sell the block of shares. Mr. Much concluded that gross proceeds to J.R. Simplot Co. would approximate $173.7 million. As an alternative means of realizing value, Mr. Much considered selling the Micron Technology stock via a secondary stock offering. Using this means of selling the stock, Mr. Much determined that J.R. Simplot Co. would realize $176.4 million. Mr. Much then considered income taxes payable as a result of J.R. Simplot Co.'s selling its Micron Technology holding. Using the estimated $176.4 million sale proceeds (via a secondary stock offering), and after considering corporate income taxes (40 percent) on the gain, Mr. Much determined the maximum amount of net proceeds J.R. Simplot Co. would realize from the sale of its Micron Technology stock was $111,193,870.

---

[9] Micron Technology maintained a trading "blackout" policy that prohibited insider transactions in the stock for a period from 30 days before the end of each quarter until after each quarterly earnings announcement (which typically occurred approximately 2-3 weeks following the end of every quarter).

Inasmuch as Mr. Much valued decedent's J.R. Simplot Co. shares on a marketable, minority-interest basis, he believed the same basis should be applicable to the valuation of the Company's Micron Technology holding. Accordingly, Mr. Much applied a 6-percent net minority discount[10] to the maximum amount of net proceeds J.R. Simplot Co. would receive ($111,193,870), which resulted in an equivalent marketable minority interest value of $104,522,238 for the Micron Technology shares.

In sum, Mr. Much averaged the results he determined under the market capitalization ($1,066,740,000) and discounted cash-flow ($1,079,900,000) methods, arriving at $1,073,320,000. He then added his predetermined value of the Micron Technology shares ($104,522,238) and J.R. Simplot Co.'s cash balance as of May 31, 1993 ($31,232,000), yielding an adjusted TIC value of $1,209,070,000 (rounded). He then subtracted interest-bearing debt ($564,418,000), which yielded a marketable minority equity value of $644,650,000 (rounded), or $4,560.18 per share of class A voting and class B nonvoting stock outstanding.[11] (In making the

---

[10] Mr. Much applied this discount because, in his view, a minority shareholder of J.R. Simplot Co. could not force the sale of the Micron Technology shares.

[11] Mr. Much calculated the $644,650,000 marketable minority equity value of J.R. Simplot Co. as follows:

Total invested capital
(J.R. Simplot operations)        $1,073,320,000

Value of Micron Technology
shares                              104,522,238

(continued...)

adjustments for long-term debt and cash, Mr. Much believed that under the discounted cash-flow method, all interest-bearing debt must be taken into account, and the inclusion of cash provides an adjustment to reflect the seasonal nature of the Company's operations.)

Next, Mr. Much turned his attention to the relative voting premium, if any, to be accorded the 18 class A voting shares vis-a-vis the value of the 3,942.048 class B nonvoting shares, using the following factors: (1) The potential for economic benefits (if any) which might be attributable to class A shareholders and not to class B shareholders; (2) market-based evidence of the allocation of sale proceeds between dual class voting and nonvoting shares of public companies involved in a sale or takeover; and (3) market-based evidence of daily trading market data for public companies with dual classes of voting and nonvoting shares.

In ascertaining the potential economic benefits attributable to the class A voting shares, Mr. Much reviewed the compensation

---

[11](...continued)

| | |
|---|---|
| Cash balance (May 31, 1993) | 31,232,000 |
| Adjusted total invested capital (rounded) | 1,209,070,000 |
| Interest bearing debt | (564,418,000) |
| Equity value of J.R. Simplot Co. (rounded) | 644,650,000 |

and prerequisites received by the class A voting shareholders[12] and examined J.R. Simplot Co.'s policy of not paying dividends and the absence of any foreseeable sale or liquidation of, or public offering by, J.R. Simplot Co.

Mr. Much first studied 14 transactions involving the sale/merger/acquisition of publicly traded companies listed on the stock exchange involving dual class securities. These transactions involved a pro rata allocation of the sale proceeds (based upon equal prices paid to both the voting and nonvoting shares). (Mr. Much noted that in a hypothetical sale of J.R. Simplot Co.'s assets or a liquidation of the Company, the maximum value a class A shareholder would receive would be based on a pro rata share allocation with the other class A and class B shareholders.) Second, Mr. Much reviewed daily trading market data of public companies with dual classes of voting and nonvoting shares, determining that the relative proportion of the equity represented

---

[12]    The following is a review of the compensation and perquisites of J. R. Simplot Co.'s class A voting shareholders:

| Name | Class A Shares | 1991 | 1992 | 1993 |
|------|---------------|------|------|------|
| Gordon C. Smith | --- | $562,721 | $769,890 | $722,005 |
| J.R. Simplot | --- | 314,780 | 314,519 | 314,311 |
| Don | 18 | 246,385 | 314,628 | 235,972 |
| Decedent | 18 | 222,730 | 200,801 | 79,785 |
| Scott | 22.445 | 122,301 | 17,140 | --- |
| Gay | 18 | --- | --- | --- |

According to Mr. Much, an independent third-party purchaser of decedent's 18 class A voting shares on a stand-alone basis would lack the power of control. Thus, the purchaser would look to other economic benefits in making an investment decision.

by voting and nonvoting stock is essentially irrelevant to any difference in value between those shares.[13]

Mr. Much concluded that no difference existed in the per-share value (i.e., voting rights premium) between J.R. Simplot Co.'s class A voting and class B nonvoting shares primarily because the class A shareholder could not extract economic benefits. Mr. Much believed that even if a difference existed, it was negligible. However, he testified that, on the basis of the available data, and everything being equal, he would not "quibble" with valuing decedent's class A voting shares at approximately 5 percent more than decedent's class B nonvoting shares. In his opinion, this premium would not be based on economics but rather on a "feel good" basis for having the right to vote. Nevertheless, Mr. Much opined that any premium for the feel-good right to vote would be offset by the liquidation preference in favor of the class B nonvoting shares and the right of first refusal encumbering the class A voting shares.

Finally, Mr. Much determined that the discount for lack of marketability of the stock would range from 10 to 40 percent of his determined marketable minority value. After reviewing several restricted stock studies, and giving consideration to the 360-day restriction placed on the class A voting stock, Mr. Much concluded that a 35-percent discount for lack of marketability was

---

[13] In analyzing the 14 transactions discussed above, Mr. Much determined that the ratio of outstanding voting shares to total shares outstanding ranges from 9.8 percent to 92 percent and is not correlated with a voting premium.

appropriate for both the class A voting and class B nonvoting shares.

After applying this 35-percent lack of marketability discount (to the $4,560.18 per-share value), Mr. Much concluded that as of the valuation date, the fair market value of both the 18 class A voting shares and 3,942.048 class B nonvoting shares of J.R. Simplot Co., on a nonmarketable, minority-interest basis, was $2,964.10 per share (based on a combined 141,365.029 shares of J.R. Simplot Co.'s common stock issued and outstanding).

### 2. John R. Ettelson

Petitioner's second expert, John R. Ettelson, is a senior banker in the corporate finance department of William Blair & Co., L.L.C., an investment banking and securities brokerage firm. Mr. Ettelson was requested to render an opinion as to the voting rights premium, if any, to be assigned to decedent's 18 class A voting shares vis-a-vis decedent's 3,942.048 class B nonvoting shares. He was not requested to render an opinion as to the per-share value of the class A or class B stock as of decedent's death. In performing his assignment, he focused on those public corporation having a substantial value with the per-share price of their stock being high (rather than low), working under the assumption that the equity value of J.R. Simplot Co. on the valuation date was in excess of $600 million and the value of its shares in excess of $3,000 per share.

Mr. Ettelson began his analysis by considering the mindset and objectives of a hypothetical buyer of decedent's 18 class A voting

shares. He stated that such a buyer would expect his investment in J.R. Simplot Co. to provide an economic return[14] over time.

Mr. Ettelson concluded that a buyer would not pay a significant premium for decedent's class A voting shares vis-a-vis decedent's class B nonvoting shares because the voting rights acquired with the class A shares could not influence the buyer's economic return. In reaching this conclusion, Mr. Ettelson believed that because the controlling voting power of J.R. Simplot Co. was held by only three individuals (other than decedent), all of whom were related and had family interests to protect, a hypothetical "outside" investor would have difficulty changing the Simplot family's philosophy with regard to dividends, salaries, and other perquisites. He further believed that an outside investor would have difficulty in building a majority position (from the investor's 23.55-percent minority interest) due to the fairly even distribution of the class A voting stock among the three family members and their desire to maintain control of the Company within the family group.

Mr. Ettelson examined empirical market data, reviewing approximately 40 public company dual class stock situations where

---

[14] According to Mr. Ettelson, a buyer's economic return consists of the future stream of dividends or other forms of cash benefits such as salary, expense reimbursements, or other perquisites that the buyer could reasonably expect to receive from his ownership of the 18 class A voting and 3,942.048 class B nonvoting shares, as well as any "exit dividend" (the amount received when the buyer sells or liquidates his shares individually or through the sale or liquidation of the business).

market capitalizations exceeded $75 million. He found that in situations where both classes of stock traded publicly between January 1990 and June 24, 1993, and where only one class held the voting power and no dividend rights or other economic disparity existed, the class with the voting power traded at an average 4.1-percent premium over the per-share value of the nonvoting stock, with a maximum price difference of 14.2 percent. According to Mr. Ettelson, on June 24, 1993, the sample group of voting stock traded at an average of 1.7 percent over the per-share value of the nonvoting stock, with a maximum price difference of 10.3 percent.

Mr. Ettelson also studied publicly traded companies from June 24, 1993 to 1998, where only one class held the voting power and no economic disparity in favor of the voting shares existed. The average voting rights premium in such cases was 2.8 percent. In examining studies by others, he noted that the shares of stock having voting or greater voting rights traded at a premium of 5.4 percent to 9.2 percent relative to nonvoting shares.

Mr. Ettelson opined that no material economic benefit or advantage existed to owning the 18 class A voting shares. Thus, he stated he would not advise a hypothetical buyer to pay a significant voting rights premium for decedent's class A stock in excess of what he observed in the public markets (i.e., a typical range of 3 to 7 percent, and occasionally up to 20 percent over the fair market value of a nonvoting share).

B. Valuations of Respondent's Experts

1. Herbert T. Spiro

Respondent's first expert, Herbert T. Spiro, has been president of American Valuation Group, Inc., a consulting firm specializing in economic analyses and financial valuations, since 1985, as well as a professor of finance at California State University at Northridge. In his expert report submitted for trial, Dr. Spiro concluded that as of the valuation date, the fair market value per share of J.R. Simplot Co.'s class A voting stock was $616,116.36, and the value per share of J.R. Simplot Co.'s class B nonvoting stock was $3,522.79 (resulting in the value of 18 shares of class A voting stock at $11,090,094 and 3,942.048 shares of class B nonvoting stock at $13,887,007).

Dr. Spiro's approach in determining an equity value for J.R. Simplot Co. was generally similar to that of Mr. Much. First, he valued J.R. Simplot Co. exclusive of its Micron Technology investment and then added the value of the Micron Technology investment to determine the total equity value of J.R. Simplot Co.

In determining the value of J.R. Simplot Co. exclusive of its Micron Technology holding, Dr. Spiro (in a manner similar to that of Mr. Much) used both the income and market approaches[15] and then

_____

[15] According to Dr. Spiro, the income approach is based on the premise that a rational buyer of an asset would pay only the equivalent of the present value of the net cash stream realized from the asset. Future cash inflows and outflows are projected in this analysis and then discounted to the present to yield a value. The market approach presumes that the most an investor will pay for an asset is the price other investors are currently

(continued...)

reconciled the resulting values.  Dr. Spiro used discounted free cash-flow projections[16] to determine the value of J.R. Simplot Co. (exclusive of its Micron Technology holdings) under the income

_____

[15](...continued)
paying for identical assets.

[16]     Dr. Spiro defined "free cash flow" as the amount of cash that could be drawn out of the business without impairing operations, and represents the maximum amount of money available to long-term debt and equity holders.   Under this valuation method, a calculation is made as to the level of sustainable cash-flow the business can be expected to generate in the future.

approach, determini ng a $720,926,000[17] aggregate equity value for

J.R. Simplot Co. on the valuation date.

_____

[17] Dr. Spiro's calculations (in millions) were as follows: (We note that mathematically his calculations are slightly off.)

|  | 8/31/94 | 8/31/95 | 8/31/96 | 8/31/97 | 8/31/98 |
|---|---|---|---|---|---|
| Net income | $59,900 | $70,033 | $80,908 | $92,329 | $96,133 |
| Cash-flow adjustments: (+)depreciation | 75,097 | 81,104 | 86,782 | 91,989 | 96,588 |
| (−)Capital Expenditures | (96,278) | (103,980) | (111,259) | (117,934) | (123,831) |
| (−)Working capital additions | (20,669) | (20,026) | (18,924) | (17,356) | (15,331) |
| Free cash-flow | 18,051 | 27,131 | 37,506 | 49,027 | 53,559 |
| Discount rate | 10.20% | | | | |
| Present value factor | 0.9526 | 0.8644 | 0.7844 | 0.7118 | 0.6459 |
| Present value of cash-flow | 17,195 | 23,453 | 29,421 | 34,899 | 34,595 |
| Total present value of cash-flows | 139,563 | | | | |
| Present value of reversion | 956,900 | | Reversion cash-flow: $80,802[1] | | |
| Business enterprise value | 1,096,462 | | | | |
| Less total long-term debt as of 5/31/93 | 375,536 | | | | |
| Aggregate equity value-liquid minority basis | 720,926 | | | | |

[1] Dr. Spiro explained that the discounted cash-flow model projects cash-flows independently for 5 years. However, the business is expected to generate cash-flows after the 5th year of the forecast. The present value of the cash-flows that the business is expected to generate after the 5th year or, equivalently, the present value of the reversion, is calculated using the Gordon Model formula (or Dividend Discount Model).

Then, Dr. Spiro used a market valuation approach, focusing on three food companies (ConAgra, H.J. Heinz, and Universal Foods) and one fertilizer company (Vigoro), with size and business operations comparable to J.R. Simplot Co.'s two primary divisions. He compared relevant ratios (price-to-revenue; price-to-cash-flow; price-to-EBIT; price-to-EBDIT) and data for J.R. Simplot Co. and the chosen comparable companies as of their most recent fiscal year or 12-month period,[18] concluding: (1) J.R. Simplot Co. was smaller than the average of the four comparable companies in revenue; (2) the average comparable company used less debt in its capital structure than J.R. Simplot Co., and J.R. Simplot Co.'s debt-to-assets ratio was higher than the average of the comparable companies; (3) based on revenue and income growth rates, J.R. Simplot Co. was growing faster than all of the comparable companies (only H.J. Heinz increased its assets faster, primarily due to several acquisitions); (4) profitability ratios indicated that J.R. Simplot Co. and ConAgra were less profitable than the other

---

[18] Because J.R. Simplot Co.'s sales and profitability figures were unavailable for the 12 months preceding the valuation date, and the Company's fiscal yearend data was sufficiently removed from the valuation date to be of limited direct use, Dr. Spiro used two methods to derive J.R. Simplot Co.'s revenue, earnings, and performance ratios. The first method is based on a fiscal 1993 forecast prepared by J.R. Simplot Co.'s management in May 1993. Certain financial statistics were not computed for the fiscal 1993 period because of insufficient support data. Second, Dr. Spiro derived performance measures for the Company by annualizing operating data for the 9 months ended May 31, 1993.

comparable companies; and (5) J.R. Simplot Co. was more liquid than most of the comparable companies.

Dr. Spiro concluded that J.R. Simplot Co. was smaller and less profitable than the average comparable company but was growing faster and had slightly greater liquidity than the comparable companies. (Dr. Spiro believed that J.R. Simplot Co. most closely resembled ConAgra.[19]) Dr. Spiro used a weighing process for his valuation ratio indicators and as a result determined a $719,809,754 fair market value for J.R. Simplot Co. under the market approach.

Dr. Spiro then averaged the values he determined for J.R. Simplot Co. under the market ($719.8 million) and income ($721 million) approaches, arriving at $720 million.[20]

(According to Dr. Spiro, the value of J.R. Simplot Co. arises from its resources, which, if properly used, could have yielded a higher return. Dr. Spiro believed that if the Company had sufficient equity capital, the Company could potentially be a giant. Thus, in Dr. Spiro's opinion, J.R. Simplot's balance sheet is not reflective of the Company's true value. He based his valuation of the Company using the cash-flow generated but noted

---

[19]     According to Dr. Spiro, both companies have substantial operations in food processing, fertilizers, and crop protection products, as well as low gross and net margins. In Dr. Spiro's opinion, because J.R. Simplot Co. is growing faster than ConAgra, the applicable multiples would be increased.

[20]     As subsequently discussed, except for a disagreement about how short-term debt factors into the value, as well as a minority discount in valuing the Company's Micron Technology shares, this amount is close to that determined by Mr. Much.

that the Company's cash-flow could have been substantially greater if the assets of the Company had been better used. Thus, in Dr. Spiro's opinion, if the hypothetical buyer could maximize the Company's cash-flows, the aggregate equity value of the Company would be greater than $720 million.)

The next step of Dr. Spiro's analysis was to determine the fair market value of J.R. Simplot Co.'s interest in Micron Technology on a freely traded, minority basis. He multiplied Micron Technology's share price on June 24, 1993 ($34.63)[21] by the number of shares J.R. Simplot Co. owned (5,259,800) and arrived at $110,269,092.[22] (For purposes of this analysis, Dr. Spiro assumed that any perceived blockage discount would be offset by the anticipated premium from a sale of the block.)

Dr. Spiro then added the $110,269,092 valuation of J.R. Simplot Co.'s Micron Technology holdings to the $720 million fair market value of J.R. Simplot Co., rendering a total of $830 million[23] aggregate equity value (rounded) for J.R. Simplot Co. on a freely traded, minority-interest basis.

At this point, Dr. Spiro used the $830 million fair market value to ascertain the value of decedent's class A voting and class

---

[21] This is an average of the high and low prices reported during trading on June 24, 1993.

[22] Dr. Spiro deducted estimated underwriting costs of 3.825 percent and estimated taxes of 40 percent attributable to the appreciation in value of the Micron Technology shares.

[23] In Dr. Spiro's expert witness report, he arrived at a $900 million aggregate equity value. Subsequently, he revised this value to $830 million.

B nonvoting stock. In addressing the economic theory underlying voting rights valuation, Dr. Spiro opined that because decedent's class A voting stock constitutes only a 23.55-percent voting interest in J.R. Simplot Co., it does not enable the hypothetical buyer to exercise all the prerogatives of control. However, relying on empirical evidence, Dr. Spiro noted that nonmajority voting blocks of sufficient size are valued at a premium in the marketplace in excess of the pro rata equity value represented by those blocks. Moreover, analyzing the available studies, Dr. Spiro suggested that voting premiums, if measured on a per-share basis against nonvoting or low-voting shares (a "simple voting premium"), are affected by the scale factor--generally, a small proportion of voting stock in a capital structure tends to produce a high per-share voting premium, pointing to the utility of calculating the value of the aggregate voting stock as a percentage of total equity capitalization (the "aggregate voting rights percentage").

Dr. Spiro also analyzed U.S. public markets, noting their limitations and impediments to the trading of nonvoting stock. In his view, it is unlikely that a company with a similar capital structure to J.R. Simplot Co.'s would list its securities on the U.S. exchanges. Moreover, he believed that a simple voting stock price premium[24] is irrelevant to the valuation of the class A voting shares because the U.S. dual-capitalization stock price data for

_____

[24] Dr. Spiro defines a simple voting stock price premium as the percentage difference between voting share prices and nonvoting or inferior-voting share prices.

publicly traded companies would not necessarily be representative of the value of voting rights inherent in an interest in a closely held company. Dr. Spiro observed that voting premiums observed in U.S. stocks tend to be understated.

Dr. Spiro next considered the aggregate value of J.R. Simplot Co.'s class A voting stock on a 23.55-percent minority block basis. In reviewing relevant empirical evidence, Dr. Spiro found aggregate voting rights premiums ranging from 8.58 percent to 23.9 percent of the equity value of the Company. After evaluating factors which he deemed relevant (such as the lack of dividend payments, the remote possibility of liquidation, the nonmajority status of the voting stock block, the relative distribution of voting rights, the attractiveness of J.R. Simplot Co. as an acquisition target, the nature of the family-owned business, and the lack of a foreseeable takeover offer) Dr. Spiro determined that the appropriate aggregate voting rights premium applicable to decedent's block of voting shares was 10 percent of J.R. Simplot Co.'s "equity capitalization value" and then apportioned it according to decedent's 23.55-percent interest.

Thus, calculating the aggregate value of the class A voting and class B nonvoting stock of J.R. Simplot Co. on a freely traded, minority-interest basis[25] as of June 24, 1993, Dr. Spiro arrived at a pro rata value of class A voting and class B nonvoting shares of

[25] Dr. Spiro did not apply a minority discount to the value of decedent's class A voting shares because the underlying equity value of J.R. Simplot Co. was calculated on a freely traded minority-interest basis.

$5,871.32 per share ($830,000,000/141,365.029 shares), or a $947,871.32 value per class A voting share.[26] (Dr. Spiro noted that the value per vote he determined is very large because the voting block rights are allocated among an extremely small number of class A voting shares; thus, in his view, traditional valuation concepts, as used by petitioner's experts, are not applicable to the calculation of voting rights premium in this case.)

---

[26] Dr. Spiro used the following calculation to arrive at the $947,871.32 value:

| | |
|---|---|
| Aggregate value of J.R. Simplot Co. - freely traded, minority-interest basis | $830,000,000 |
| Aggregate value of J.R. Simplot Co. - freely traded, minority interest basis (excluding Micron Technology interest) | 720,000,000 |
| Value of voting rights associated with 23.55 percent interest in class A shares | |
|   Pro rata value of 23.55 percent equity interest | 169,560,000 |
|   Voting rights premium associated with 23.55 percent voting block interest | 10% |
| Value of voting rights associated with 23.55 percent voting interest | 16,956,000 |
| Total number of class A shares at issue | 18 |
| Additional value per share of voting rights associated with 23.55 percent voting block interest | 942,000.00 |
| Total class A and class B common shares outstanding | 141,365.029 |
| Pro rata value of class A and class B shares (ignoring voting rights) | 5,871.32 |
| Value per class A share held in 23.55 percent voting interest | 947,871.32 |

Dr. Spiro then applied a 35-percent lack of marketability discount to the class A voting stock, thereby reducing the value of decedent's voting shares to $616,116.36 per share. He applied a 40-percent lack of marketability discount to decedent's class B nonvoting stock, resulting in a $3,522.79 per-share value. Thus, Dr. Spiro determined a value of $11,090,094 (rounded) for decedent's 18 shares of class A voting stock and $13,887,007 (rounded) for decedent's 3,942.048 shares of class B nonvoting stock as of the valuation date.

## 2. Gilbert E. Matthews

Respondent's second expert, Gilbert E. Matthews, served as chairman of Bear, Stearns & Co.'s valuation committee from 1970 through 1995. Presently, he is chairman of the board and a senior managing director of Sutter Securities, Inc., an investment banking firm. Mr. Matthews was requested to render an opinion as to the fair market value of the class A voting and class B nonvoting stock held by decedent as of June 24, 1993, assuming the equity value of J.R. Simplot Co. was $830 million.[27] He was not retained to render an opinion as to the equity value of J.R. Simplot Co. as of June 24, 1993.

Mr. Matthews believed:

> The unusual capital structure of the Company has a
> material impact on the relative value of the Class A and
> Class B Shares. The Class A Shares, which have 100% of

---

[27] In his expert report, Mr. Matthews assumed a $900 million equity value, based on Dr. Spiro's original conclusion. Mr. Matthews subsequently amended his calculations to conform to Dr. Spiro's amended $830 million.

the votes, were only 0.054% of shares outstanding. As the Class A Shares collectively have full control of the Company, they (as a class) are worth a substantial premium over their pro rata share of enterprise value * * *

      *       *       *       *       *       *       *

In determining the relative value of the Class A Shares and Class B Shares, it is my opinion that it is necessary first to value each class of stock in its entirety, then calculate the undiscounted value per share of the Class A Shares and Class B Shares, and only then to apply the discounts for lack of marketability and for minority interest to the Estate's Class A Shares and Class B Shares. As the value of voting control held by the Class A Shares collectively is a function of the premium over economic value to the class for the voting power, it is analytically incorrect to calculate the premium for voting control on a per-share basis rather than a class basis. (In this case, the premium for the Class A Shares as a percent of the total value of the Company would not change materially if the number of Class A Shares doubled or tripled, but such change obviously would materially impact the premium per share.)

Mr. Matthews posited that the 18 shares of class A stock at issue represent a potential swing block. According to Mr. Matthews, the value of voting control held by the class A voting shares collectively is a function of the premium over economic value to the class for the voting power.

Mr. Matthews agreed with Dr. Spiro that studies of publicly traded high vote shares in U.S. markets were not useful in determining a premium for shares of J.R. Simplot Co.'s voting stock because the prices paid in public markets understate the value of blocks of shares with the potential for control. Moreover, in his mind, publicly traded stocks possess neither swing vote characteristics nor the extreme disparities in the numbers of nonvoting to voting shares present in this case.

In order to arrive at an appropriate voting premium, Mr. Matthews examined premium data from acquisitions, mergers, and recapitalizations, observing that the mean aggregate premium attributable to the "high-vote class" in relation to the "economic value" of a company was 8 percent, with a median of 5.3 percent. (Although Mr. Matthews acknowledged that decedent's minority interest did not represent voting control on the valuation date, the potential for such a scenario was real and foreseeable.) After analyzing this data, Mr. Matthews concluded that an appropriate aggregate premium for J.R. Simplot Co.'s class A voting shares of 6 to 7 percent of the equity value of the Company would be fair. However, he acknowledged that the premium could be as low as 3 percent[28] of the "economic value" of the Company and still be fair.

To determine the value of each share of class A voting stock (before any discounts), Mr. Matthews calculated the aggregate premium for all class A voting shares based on J.R. Simplot Co.'s equity value and divided that amount by the total number of class A shares outstanding. To determine the value of each share of class B stock (before any discounts), Mr. Matthews subtracted the aggregate premium for all class A voting stock from J.R. Simplot Co.'s equity value and divided that amount by the total number of class B shares outstanding.

---

[28] Mr. Matthews testified that reasonable minds can differ as to the premium to be applied to the class A voting shares. In his opinion, the midpoint of the range of premiums that could be reasonable was 4 to 5 percent. A 2-percent premium was below his comfort level.

Mr. Matthews then ascertained the appropriate discounts. Considering both potential swing vote characteristics and the risks associated with decedent's 23.55-percent block of voting shares, he determined that a 15-percent discount should be applied for minority interest and lack of marketability. However, because the right of first refusal materially adversely affected the value of decedent's class A voting shares, Mr. Matthews determined that an additional discount of 35 to 40 percent was appropriate. Applying these discounts cumulatively Mr. Matthews arrived at a combined range of 45 to 49 percent for the class A voting shares.

With regard to the class B nonvoting stock, Mr. Matthews determined a 35-percent discount for lack of marketability. In reaching this conclusion, he considered J.R. Simplot Co.'s size, the industries in which it participated, and the fact that the shares were not publicly traded. (Mr. Matthews observed that to the extent J.R. Simplot Co.'s valuation is based on the market prices of shares of publicly traded comparable companies, the discount for minority interest would be implicitly subsumed in the valuation because publicly traded shares are minority interests.)

The following chart summarizes Mr. Matthews' analysis and determinations (using a 6-percent voting rights premium of the equity value of J.R. Simplot Co.):

Class A Value at 6% Premium

| | |
|---|---|
| Equity value of Simplot (Q) | $830,000,000.00 |
| Premium for class A voting shares | 6% |
| Aggregate premium for class A shares (P) | 49,800,000.00 |

| | |
|---|---|
| Number of class A shares (A) | 76.445 |
| Number of class B shares (B) | 141,288.584 |
| Total number of shares (T) | 141,365.029 |

| | |
|---|---|
| Economic value per share (E) = Q/T | 5,871.32 |
| Class A premium per share = P/A | 651,448.75 |

| | |
|---|---|
| Value per class A share before discounts | [1]657,320.08 |

Discounts for minority, lack of
 marketability, and right of first
 refusal (class A)
   (1 - 0.15) x (1 - 0.35) = .5525 = 45% (rounded) discount
   (1 - 0.15) x (1 - 0.40) = .51 = 49% discount

Per share value of decedent's class A shares:
| | |
|---|---|
| After 45% discount | 361,526.04 |
| After 49% discount | 335,233.24 |

Total value (rounded) of decedent's 18 class A
  shares:
| | |
|---|---|
| After 45% discount | 6,507,469 |
| After 49% discount | 6,034,198 |

   [1] We note that mathematically Mr. Matthews' calculation is off by 1 cent.

Class B Value Using 6% Class A Premium

| | |
|---|---|
| Economic value per share (E) = Q/T | $5,871.32 |

| | |
|---|---|
| Economic value of all class B shares (V) =<br> E x B | 829,551,166.60 |
| Less: Aggregate premium for class A shares (P) | (49,800,000.00) |
| Net value of all class B shares = V - P | 779,751,166.60 |

| | |
|---|---|
| Value per class B share before discounts =<br> (V - P)/B | 5,518.85 |

Discount for lack of marketability (class B) = 35%

| | |
|---|---|
| Per share value of decedent's class B shares<br> after 35% discount | 3,587.26 |

| | |
|---|---|
| Total value (rounded) of decedent's 3,942.048<br> class B shares after 35% discount | 14,141,134 |

C.  Court's Analysis and Conclusions

The respective valuation methodologies adopted by the parties' experts produced vastly different results.  Petitioner's experts used a simple, traditional methodology to value an unusual corporate capital structure, which resulted in little or no premium for voting rights.  On the other hand, respondent's experts used a valuation methodology which, given the Simplot family's philosophy, appears to accord the class A stock an extraordinarily high premium for its voting privileges.

Not unexpectedly, petitioner's experts found fault with the analyses and conclusions of respondent's experts and vice versa.  We agree that each of the experts' analyses and conclusions is subject, to an extent, to valid criticism.  Specifically, we believe, among other things, the situations involved in the data and studies relied upon by both sets of experts to be so different from the situation involved herein that such data and studies are inapplicable to the case at hand.

The differing views of the experts as to the proper methodology to be used in valuing decedent's class A voting shares vis-a-vis his class B nonvoting shares illustrate the difficulty in valuing shares of unlisted stock in a large, family-controlled corporation.  Moreover, those differing views give credence to the belief that valuation is at best an inexact science.

The aforesaid notwithstanding, in fulfilling our task, we deem it proper to value decedent's shares of class A voting and class B nonvoting stock in J.R. Simplot Co. using one of the expert's

valuation methodologies. Therefore, as explained in more detail infra, giving consideration to all the facts and circumstances presented in this case (in particular, the ratio of the number of outstanding shares of voting stock to that of the nonvoting shares, 1 to 1,848), and having dissected, analyzed, and evaluated the reports as well as the testimony of all the experts, we find the valuation methodology of respondent's experts (that is, a premium should be accorded to the voting privileges of the class A stock and the collective premium for those privileges should be expressed in terms of a percentage of the equity value of J.R. Simplot Co.) more persuasive than the valuation methodology of petitioner's experts (that is, the premium, if any, to be accorded to the voting privileges should be expressed in terms of a percentage of the value of the class B nonvoting stock). Consequently, we adopt respondent's experts' valuation methodology, with modifications, in determining the fair market value of decedent's 18 shares of class A voting stock and 3,942.048 shares of class B nonvoting stock of J.R. Simplot Co. as of the valuation date.

We wish to stress at the outset that we are not valuing the premium for controlling voting power, but rather the premium for voting rights. The premium for controlling voting power would be substantially greater than the premium we determine for voting rights.

Having selected respondent's experts' valuation methodology, we must now determine (1) the equity value of J.R. Simplot Co. as of the valuation date, and (2) the appropriate collective voting

premium (expressed as a percentage of the equity value of J.R. Simplot Co.) to be accorded the class A voting stock.

In determining the proper equity value of J.R. Simplot Co., Mr. Much and Dr. Spiro used similar approaches. They began by valuing J.R. Simplot Co. exclusive of its Micron Technology holding and later added the value of the Micron Technology holding. In determining the equity value of J.R. Simplot exclusive of its Micron Technology holding, both used the income and market approaches and averaged the two values obtained. Excluding the investment for Micron Technology and the reduction for short-term debt, the values that Mr. Much and Dr. Spiro determined are not materially different. These values can be summarized as follows:

|  | Income Approach | Market Approach |
| --- | --- | --- |
| Mr. Much | | |
| Total Invested Capital | $1,079,900,000 | $1,066,740,000 |
| Plus Cash | 31,232,000 | 31,232,000 |
|  | 1,111,132,000 | 1,097,972,000 |
| Less: Long-term debt | (375,536,000) | (375,536,000) |
| Net value | 735,596,000 | 722,436,000 |
| | | |
| Dr. Spiro | | |
| Net value | 720,926,000 | 719,809,000 |

As is discernible from this chart, under the income approach the values are within 2 percent of each other, and under the market approach the difference is less than 1 percent. Dr. Spiro's average of the two values is $720,000,000 (rounded), which is approximately 1 percent less than Mr. Much's average value of $729,016,000.

The nominal disparity in their respective equity values arises from adjustments Mr. Much made for the Company's short-term debt ($188,882,000) and for a 6-percent minority discount in valuing the

Company's Micron Technology holding.  Mr. Much valued J.R. Simplot Co. by reviewing financial statements for the 5 fiscal years ended August 1988 through 1992, and for the 9-month period ended May 1993.  The adjustments he made to his values for cash and debts of the Company were derived from information on the quarterly financial statement for the quarter ended May 1993.

J.R. Simplot Co.'s controller, James D. Crawford, testified that Mr. Much improperly failed to account for the seasonally high levels of the Company's receivables and inventory.  According to Mr. Crawford, because the Company's business was seasonal, its financial statements from one quarter to another were not comparable.  Mr. Crawford explained that the Company's balance sheet for the quarter ending in May would have higher levels of inventory, receivables, and short-term debt than its balance sheet for the year ending in August.  (The high levels of inventory and receivables were financed with working capital, resulting in high short-term debt.)  Mr. Crawford estimated that the Company's short-term debt would have varied by approximately $150 million between May and August 1993.  We found Mr. Crawford a credible witness.

Mr. Much admitted at trial that if the seasonal changes in short-term debt were not taken into consideration the equity value as of August 1993 would be approximately $113,000,000 higher than his value as of late June 1993.  We believe that the high short-term debt of the Company as of May 1993 is an aberration, and as a result it should not have been taken into account.

In addition to not adjusting for the seasonal nature of short-term debt, in our opinion, Mr. Much should not have discounted the value of the Micron Technology stock by applying a 6-percent minority discount. He valued both the operating assets of J.R. Simplot Co. and its investment in Micron Technology on a minority basis. Applying a 6-percent minority discount to the Micron Technology stock has the effect of taking two minority discounts. Although we agree with Mr. Much's argument that as a minority shareholder in Micron Technology, J.R. Simplot Co. would lack absolute control with regard to any disposition of the Micron Technology stock, we do not believe a greater discount for an investment asset than for an operating asset is justified when the Company has already been valued on a minority basis.

To conclude this aspect of our valuation task, we believe Mr. Much's determination of J.R. Simplot Co.'s equity value contained two major flaws. Consequently, although we believe the equity value of the Company may be greater than $830 million, we adopt Dr. Spiro's $830 million equity value. (We note that Dr. Spiro stated that if the Company's cash-flows could have been maximized, the equity value of J.R. Simplot Co. would be greater than $830 million. Further, we are mindful that the Company is resource rich, and as Gordon C. Smith, the CEO and president of the Company in 1993, testified, the Company has assets worth substantially more than their book values.)

We now turn our attention to the more difficult task--ascertaining the amount of the collective voting premium (expressed

as a percentage of J.R. Simplot Co.'s $830 million equity value) to be accorded the class A voting stock.

Petitioner's experts used what Dr. Spiro referred to as a "cookie cutter" methodology, which he and Mr. Matthews found unsuitable in this case. We do not accept petitioner's experts' assertion that no difference exists between minority voting shares and nonvoting shares, as well as their conclusion that the value of the shares of class A voting and class B nonvoting stock were the same. Common sense dictates otherwise. We believe petitioner's experts failed to give due consideration to the hypothetical seller's desire to achieve the highest price obtainable for his/her stock.

Here, only four persons held all the class A voting stock, and there was a relatively equal distribution of this class of stock among them. In our opinion, the class A shares, on a per-share basis, are far more valuable than the class B shares because of the former's inherent potential for influence and control of the Company. And because of the Company's size and resources, having a voice (even though not a controlling voice) in the Company is valuable. Indeed, there was testimony that the Company would be worth even more if it were managed differently and divested itself of its unprofitable agriculture (cattle) group. According to Gordon C. Smith, the Company needed cash in order to remain competitive and ultimately a choice would have to be made to merge the Company with or into another entity, sell some of the Company's

assets, or take the Company's stock public. Only the holders of the voting stock would make these decisions.

We agree with respondent's experts that through ownership of decedent's voting shares, a hypothetical buyer would gain access to the "inner circle" of J.R. Simplot Co., and by having a seat at the class A shareholder's table, over time, the hypothetical buyer potentially could position itself to play a role in the Company. In this regard, we are mindful that "a journey of a 1,000 miles begins with a single step."

At this point, we consider the characteristics of the hypothetical buyer of decedent's class A voting shares. The hypothetical buyer might well be one or a group of investors or even one of the Simplots. The investor(s) might be a competitor, supplier, or major customer of J.R. Simplot Co. The hypothetical buyer would probably be well financed, with a long-term investment horizon and no expectations of near-term benefits.[29] The hypothetical buyer might be primarily interested in only one of J.R. Simplot Co.'s two distinct business activities--its food and chemicals divisions--and be a part of a joint venture (that is, one

---

[29] Petitioner claims that because J.R. Simplot was 90 years old and living at the time of trial, the Simplot family has unusually good genes. Thus, the argument was made that a good possibility existed for Don, Gay, and Scott to live until a ripe old age, and the class A voting shares would wind up in J.R. Simplot's grandchildren's hands later rather than sooner.

Decedent died at the age of 59. Apparently, J.R. Simplot's "good genes" were of limited assistance to him. The length of one's lifetime is unpredictable; no assurances exist that Scott, Don, and Gay will live until the age of 90.

venture being interested in acquiring the food division and the other being interested in acquiring the chemical division).

We agree with respondent's expert that on the valuation date, a hypothetical buyer would consider the likelihood that one day decedent's block of voting shares potentially could become the largest block of voting shares because the record reveals that Don, Gay, and Scott intended, upon their deaths, to pass their class A shares to their children and thereafter no one shareholder (other than the hypothetical buyer) would own 18 shares of voting stock. Moreover, we agree with respondent that it was foreseeable on the valuation date that following the deaths of Don, Gay, and Scott, third-generation Simplots (a multiple number of descendants with different personal objectives) would most likely be more willing to sell their class A voting shares to outsiders than their parents or grandfather would. And at that time, the hypothetical buyer would benefit from the right of first refusal restriction on the voting stock.

Petitioner asserts that Don, Gay, and Scott acted as a cohesive group in following J.R. Simplot's philosophy to operate the Company in a manner ensuring its perpetual existence and to pass their shares and philosophy to their children. We believe this assertion to be flawed in that J.R. Simplot was the glue that bonded Don, Gay, and Scott. Indeed, Mr. Ettelson testified that, over time, chances increase that closely held companies will eventually sell, merge, or go public.

We agree with respondent that

>     The key to acquiring control of Simplot is the Class
> A shares.  The investor would likely pay large premiums
> (in cash or stock) to induce the Class A shareholders to
> relinquish control.  Once a majority interest of the
> Class A shares is obtained, the investor could force a
> merger into another company.

>        *        *        *        *        *        *        *

>     The disparate ratio of nonvoting to voting stock in
> this case is particularly important because it
> dramatically increases, on a per share basis, the value
> of the Class A shares. * * *  When there are very few
> voting shares, as here, the result is a huge increase in
> the per share value of the voting rights associated with
> the Class A shares.  Simplot's extreme ratio of nonvoting
> to voting shares--1,848.24 to one, with only
> approximately 76 voting shares--magnifies the per share
> premium by a thousand times or more compared to any
> company with a typical single digit ratio.

Dr. Spiro opined that the amount of the collective voting premium should equal 10 percent of J.R. Simplot Co.'s equity value. Mr. Matthews selected a lesser amount.  He stated that an amount ranging from 7 percent (on the high side) to 3 percent (on the low side) of the equity value would be a "fair" collective premium for the voting privileges.

We recognize that on the valuation date the hypothetical buyer of decedent's 18 shares of class A voting stock would not have the ability to control the Company's management and would be subject to the philosophy of the other three class A shareholders, all of whom were related and had family interests to protect.  And obviously, an investor would pay more for a block of stock that represents control than for a block of stock that is only a minority interest

in the Company.  On the other hand, here, no one individual had a controlling block of voting stock.

We also recognize that Don, Gay, and Scott would want to maximize their children's interest in the Company and that if a sale or liquidation of J.R. Simplot Co. occurred or if the Company merged with or into another, the benefits derived therefrom would probably be distributed not by class of stock, but rather on an equal per-share basis, regardless of class.  In other words, after having paid for voting privileges, if on or after June 24, 1993, the Company were merged, sold, or liquidated, the hypothetical buyer would suffer a loss if the proceeds of the sale, merger, or liquidation were to be distributed among all shareholders of J.R. Simplot Co. on a pro rata share basis, rather than on a class basis.

On the other hand, we agree with Mr. Matthews that although on the valuation date decedent's class A voting shares constituted a minority interest in J.R. Simplot Co., it was foreseeable that one day (but not on the valuation date) the voting characteristics associated with them could have "swing vote" potential if the hypothetical buyer combined his 18 class A voting shares with Scott's 22.445 shares or joined with Don and Gay (combined having 36 class A voting shares) to form a control group.

Considering and weighing all of these factors, we adopt Mr. Matthews' lower range figure of 3 percent of J.R. Simplot Co.'s equity value as the fair premium for the voting privileges (not voting control) associated with the class A stock of J.R. Simplot

Co.   We have adopted Mr. Matthews' 3-percent premium for voting privileges because we give the greatest weight to the fact that Don, Gay, and Scott would be inclined to vote in a manner that would maximize their children's interests.   Thus, we believe the collective premium for the voting privileges of the 76.445 shares of class A stock of J.R. Simplot Co. as of the valuation date is $24.9 million (3 percent x $830 million), or $325,724.38 per share.

The following chart summarizes our valuation determinations for decedent's 18 shares of class A voting stock and 3,942.048 shares of class B nonvoting stock of J.R. Simplot Co. as of the valuation date before considering any discounts:

Class A Voting Stock Valuation

| | | |
|---|---|---|
| Number of class A shares (A) | 76.445 | |
| Number of class B shares (B) | 141,288.584 | |
| Total number of shares (T) | 141,365.029 | |
| | | |
| Equity value of J.R. Simplot Co. (Q) | $830,000,000 | |
| Pro-rata share of equity value (E) = Q/T | | 5,871.32 |
| | | |
| Premium for voting privileges on a per share basis | | 325,724.38 |
| | | |
| Value per share | | 331,595.70 |
| | | x 18 |
| Value of decedent's 18 shares of class A voting stock, before discount | | 5,968,772.60 |

Class B Nonvoting Stock Valuation

```
Equity value of J.R. Simplot Co.              $830,000,000
Less:  Aggregate premium for voting
  privileges (76.445 shares x $325,724.38) (24,900,000)
Less:  Aggregate class A share portion of
  equity value (76.445 shares x $5,871.32)      (448,833)
Net value of all class B shares              804,651,167

Value of class B stock on a per share
  basis ($804,651,167 ÷ 141,288.584)                 5,695.09
Value of decedent's 3,942.048 shares of            x 3,942.048
  class B nonvoting stock, before discount      22,450,318.14
```

All of the experts agreed that a lack of marketability discount (liquidity discount) is appropriate; they essentially agreed that the proper discount should be approximately 35 percent, although Dr. Spiro allowed a 40-percent liquidity discount for the class B nonvoting stock. Dr. Spiro believed that although a restriction of the transferability of the class A voting stock existed, decedent's class B shares should be given a slightly higher liquidity discount because the class B stock lacks voting rights. We adopt Dr. Spiro's liquidity discounts of 35 percent for decedent's class A shares and 40 percent for decedent's class B shares. Therefore, we find and thus conclude that the fair market value of decedent's 18 shares of class A voting stock of J.R. Simplot Co., as of the valuation date, is $3,879,702.19 or $215,539.01 (rounded) per share, and the fair market value of decedent's 3,942.048 shares of class B nonvoting stock of J.R. Simplot, as of the valuation date, is $13,470,190.88 or $3,417.05 (rounded) per share.

A few final words before leaving the valuation issues. We recognize the disparate ratio of our determined value before

consideration of a liquidity discount of the class A voting stock ($331,595.70 per share) to that of the class B nonvoting stock ($5,695.09 per share), that is a ratio of approximately 58 to 1. This disparity is the consequence of the unique capital structure of J.R. Simplot Co. and the skewed ratio of the number of class A voting shares to the class B nonvoting shares, that is, approximately 1 to 1,848.

Issue 3.  Marital Deduction

The next issue is the amount of the section 2056 marital deduction to be allowed the estate.

Decedent bequeathed all of his class A voting stock, and so much of the class B nonvoting stock as, when added to the value of the voting stock, equaled the Federal estate tax return filing requirement in effect at the time of his death (i.e., $600,000) to the trustees of a testamentary trust for the benefit of his children (the credit shelter trust).  The residue of decedent's estate was bequeathed to his wife.

Decedent's will provides:  (1) Decedent's personal representative is to pay all State transfer and inheritance taxes payable by reason of a bequest or devise to a devisee and to charge the amount paid against the distributive interest of that devisee, and (2) all Federal estate taxes imposed against the estate are to be paid out of the residue that passes to decedent's wife.

In the notice of deficiency, respondent reduced the amount reported for the marital deduction from $15,127,237 to $1,723,437. The amount of this reduction ($13,403,800) is due to respondent's

redetermining of the fair market value of the class A voting stock and charging the determined estate tax deficiencies against the portion of the estate (the residue) passing to the wife. In calculating the amount of the marital deduction, respondent gave no consideration to the fact that the transfer tax liability payable to the State of Idaho with respect to the class A voting stock bequeathed to the credit shelter trust is chargeable against the trustees.

Under section 2011, an estate may claim a credit against the Federal estate tax for State transfer and inheritance taxes paid. This credit generally applies to State and inheritance taxes paid and claimed within 4 years of the filing of the original estate tax return. See sec. 2011(c). Where the taxpayer has filed a petition with this Court, this 4-year period is extended for 60 days after the decision of this Court becomes final. See sec. 2011(c)(1).

Here, no transfer or inheritance taxes to the State of Idaho have yet been paid. See sec. 20.2011-1(c)(2), Estate Tax Regs., regarding proof of payment. Accordingly, respondent correctly did not include in the computation of the amount of the marital deduction an amount of State transfer and inheritance taxes chargeable against the bequest of the class A voting stock to the trustees of the credit shelter trust.

The amount of the marital deduction must be recalculated on the basis of our determination as to the value of the class A voting stock passing to the trustees of the credit shelter trust. Hence, a Rule 155 computation is required. In calculating the

amount of the marital deduction, the parties must consider (and not reduce the marital deduction by) the amount of State transfer and inheritance taxes actually and timely paid by reason of the bequest of the class A voting stock to the trustees of the credit shelter trust.

Issue 4.  Penalties

The last issue is whether petitioner is liable for the penalties determined by respondent pursuant to section 6662(a), (g), (h)(1), and (2)(C).

A substantial estate tax valuation understatement occurs if the value of property claimed on a return is 50 percent or less of the amount determined to be its correct value, and the portion of the underpayment attributable to the understatement exceeds $5,000. See sec. 6662(g).  The penalty equals 20 percent of the portion of the underpayment attributable to the understatement.  See sec. 6662(a).  The penalty does not apply to any portion of the underpayment for which the taxpayer shows that he or she:  (1) Had reasonable cause, and (2) acted in good faith with respect thereto. See sec. 6664(c); see also United States v. Boyle, 469 U.S. 241, 242 (1985).  Whether a taxpayer had reasonable cause and acted with good faith is a factual determination.  See sec. 1.6664-4(b), Income Tax Regs.  Reliance on the advice of a professional will constitute good faith and reasonable cause where the reliance was reasonable.  See id.

Respondent argues that petitioner undervalued decedent's shares of J.R. Simplot Co.  Respondent further contends that

petitioner has failed to prove there was reasonable cause or good faith reliance for the undervaluation. Petitioner, on the other hand, maintains that it relied on professional appraisers and attorneys in preparing the return. Essentially, petitioner argues that any tax understatements were in good faith and due to reasonable cause.

The parties stipulated that "the fair market value of the Class A voting shares and Class B nonvoting shares reported on the estate tax return was based upon an appraisal report issued by Morgan Stanley & Co., Incorporated." That appraisal was prepared for the purpose of guiding the estate in preparation of its tax return.

We have found (as an ultimate fact) that petitioner acted reasonably and in good faith in relying on the advice of tax professionals and appraisers in valuing decedent's class A voting and class B nonvoting stock for Federal estate tax purposes. We believe petitioner exercised ordinary business care and prudence in attempting to determine its proper tax liability. See Mandlebaum v. Commissioner, T.C. Memo. 1995-255. Morgan Stanley was a long-time adviser to J.R. Simplot Co., having prepared annual appraisals for the J.R. Simplot Co.'s ESOP which were relied upon by both the trustees of the ESOP and the participating employee/stockholders. Thus, we hold petitioner is not liable for the penalties at issue.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.